[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 147 
The appellant was charged by indictment pursuant to Title 15, § 342 (4)(j), Code of Alabama 1940, 1975 Supplement (now § 13-11-2 (a)(10), Code of Alabama 1975), of the Alabama Death Penalty statute for the crime of "Murder in the first degree wherein two or more human beings are intentionally killed by the defendant by one or a series of acts." At arraignment the appellant entered pleas of "not guilty" and "not guilty by reason of insanity." The jury found the appellant guilty as charged in the indictment and fixed punishment at death. The trial court held a separate hearing on the aggravating and mitigating circumstances in the case wherein the death penalty as fixed by the jury was accepted and judgment was entered setting sentence at death by electrocution. The appellant was adjudged to be an indigent and is in this Court with a free transcript and court-appointed counsel. *Page 148 
The evidence presented against the appellant was overwhelming. The following is an abstract of the evidence:
Shortly after midnight on October 7, 1977, Houston County Sheriff's deputies responded to disturbance calls at the Hughes residence in Taylor, Alabama, and the Crawford residence in Rehobeth, Alabama.
At the Hughes residence, Beverly Hughes Crawford was found lying on a bed with gunshot wounds to the stomach and head. Her red Toyota automobile was found in front of the house. The windows to the Toyota were shattered and what appeared to be bullet holes were found in the right front door and in the headrest on the driver's side.
At the Crawford residence the appellant and his mother, Pauline Crawford, were found lying on the floor of Pauline's home within a few feet of each other. Both were suffering from gunshot wounds.
At approximately 2:00 a.m., Charles Crawford, brother of the appellant, was found on the Crawford farm out in a field lying next to a fence. He was shot in the back and paralyzed, but still alive. About one hour later the appellant's father, Eddie Roy Crawford, was found dead in an old Colonial bread truck body that had been converted to a peanut dryer located nearby his residence. Eddie Roy had been shot twice in the head.
The bodies of Brenda Crawford Peters, sister of the appellant, and her daughter Chris, age six, were discovered at approximately 9:00 a.m. about 100 yards off Highway 109 at the intersection of Highways 109 and 231 in Houston County. Both had multiple gunshot wounds. Devana and Eddie Peters, two small children of Brenda's, (ages 1 and 2) were found lying on top of their mother. Both were dirty, bloody and suffering from insect bites.
Charles Crawford testified that on the night of October 6, 1977, the Crawford family had eaten supper together on the Crawford farm. All the victims in this case were present at the supper meal. Charles and his wife left soon after the meal and retired to their trailer for the remainder of the night. At approximately 11:00 p.m. Charles was awakened by a knock on his bedroom window by the appellant. The appellant said the cows had gotten out and that their grandfather wanted them to find the cows. Charles left with the appellant in the appellant's truck. During the course of riding around the farm the appellant asked Charles several times to get out and look for tracks. Charles finally relented and as he walked next to an electric fence he heard the blast of a rile, felt a sting, and fell to the ground paralyzed. He then heard the truck door shut and the truck drive off.
Beverly Hughes Crawford testified that she went back to sleep after her husband and the appellant left to look for the cows. The next thing she remembered was the appellant again knocking at the window, saying that Charles had sent him back for the shotgun. When the appellant came to the front door to get the shotgun, Beverly noticed that he had Charles's rifle. As she walked to the bedroom to look for more cartridges for the guns, she was shot from behind. The appellant stated that he was sorry, that it was an accident, and that he had been shot also. Beverly did not see any blood on him. She told the appellant that she was bleeding to death and for him to find Charles. He then left.
Beverly lay on a bed in the trailer for an indeterminate length of time. She then got in her Toyota automobile and attempted to leave for her parents' home in Taylor, several miles up the road. The appellant appeared at her automobile, opened the door, took her by the arm, and said that he would help her back into the trailer. He then walked to his truck and got something out through the window. Beverly left in her automobile, stopping as she pulled onto the road to see if she could see what the appellant was doing. At that point she was hit in the neck with a gunshot that also shattered her automobile window. She left for her parents' home driving at a speed of approximately 80 miles per hour. After Beverly ran inside her parents' home, she saw the appellant drive up in front of the house holding the rifle. The appellant then left. *Page 149 
Kenneth Turvin testified that he was driving on the Taylor-Tabernacle Road between Rehobeth and Taylor at approximately 11:45 p.m. on October 6, 1977. He testified that two vehicles passed him at speeds estimated to be 80 miles per hour. He identified pictures of Beverly's Toyota and the appellant's truck as the vehicles that passed him.
Dr. Joe Sugg, a surgeon, testified that he removed part of Beverly's liver and gallbladder as a result of a gunshot wound. He also treated the appellant for a minor wound to the armpit. There were large powder burns on the appellant indicating that the weapon had been placed next to the skin and fired.
Steve Lynn Langley testified that he went by the appellant's trailer at approximately 9:00 or 9:30 p.m. on October 6, 1977. He testified that the appellant's truck was backed up to his trailer and that he was pulling out onto the road. Two small children were standing up in the seat of the truck beside the appellant. Langley could not see down in the truck. The appellant said that he was going to help his mother and daddy move peanut trailers to Headland. Langley testified that he had seen a box of rifle cartridges on the dash of the appellant's truck the day before.
During the investigation of the case, the appellant made four statements to the law enforcement authorities. In the last two statements, the appellant confessed to the murders and gave the officers the location of the rifle used in the crime.
Richard Dale Carter, a criminalist with the Alabama Department of Toxicology and Criminal Investigation, identified a rifle turned over to him by Lieutenant Joe Pitts as a .22 caliber semiautomatic Marlin Glenfield rifle. He conducted comparison tests with cartridge projectiles and cases found at various scenes of the crime. He made a determination that the cases were fired from the rile in question, but that he could not positively state that the projectiles came from the exact weapon in question. He stated that the projectiles found had the same class characteristics as those fired from a .22 caliber Marlin rifle. He testified that a .22 caliber Marlin rifle is a very common rile and that projectiles fired in .22 caliber Marlin rifles would all display common characteristics.
After the State rested its case, the appellant interposed a motion to exclude the evidence on various grounds and was overruled by the trial court.
The appellant put forth several expert witnesses concerning his insanity defense. None of the witnesses could testify that the appellant was insane either at the time of the commission of the alleged crime or at the time of their examination of him. The appellant did not testify.
 I
The appellant's first contention is that the trial court improperly excluded nine prospective jurors because of their opposition to capital punishment. More specifically, the appellant contends that it was improper for the trial court to excuse the prospective jurors ex mero motu and that the prospective jurors were excused contrary to Witherspoon v.Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). A
The appellant claims that pursuant to Title 30, Section 57, Code of Alabama 1940 (now § 12-16-152, Code of Alabama 1975) the State only and not the trial court has the right to challenge for cause a prospective juror who opposes capital punishment. He contends that this right to challenge is waived and lost if not exercised. Title 30, Section 57, supra, is as follows:
 "On the trial for any offense which may be punished capitally or by imprisonment in the penitentiary, it is a good cause of challenge by the state that the person has a fixed opinion against capital or penitentiary punishments, or thinks that a conviction should not be had on circumstantial evidence; which cause of challenge may be proved by the oath of the person or by other evidence." (Emphasis supplied) *Page 150 
The Alabama Supreme Court in the case of Williams v. State,241 Ala. 348, 2 So.2d 423 (1941), held that the trial court has the right to reject for cause ex mero motu under Title 30, Section 57, supra, any prospective juror who states that he would not convict on circumstantial evidence. We hold thatWilliams applies to the whole of the statute, thus including refusal to impose the death penalty. It should be noted that the trial court is vested with broad discretion in the excusal of prospective jurors. Title 30, Sections 4, 5, Code of Alabama 1940 (now § 12-16-4, 12-16-5, Code of Alabama 1975). We do not believe the trial court abused its discretion in this case.
 B
The holding in the case of Witherspoon v. Illinois, supra, was as follows:
 "[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. 522, 88 S.Ct. 1777
(Emphasis supplied)
The trial court's examination of the jury venire in this case was as follows:
(First group of prospective jurors)
 "THE COURT: Would either of you Ladies and Gentlemen of the Jury Venire refuse to impose the death penalty, regardless of the evidence produced by the State of Alabama?
"(Two men respond.)
 "THE COURT: All right. We have two that have raised their hands there. Let me ask you, you say that you two Gentlemen would refuse to impose the death penalty in the case regardless of what evidence might be produced?
"A MAN: That is right.
 "THE COURT: Okay. Let me ask you another question Ladies and Gentlemen. Would either of you Ladies and Gentlemen of the Jury Venire refuse to impose the death penalty under any circumstances, even if you felt it would be justified by the facts and the evidence in the case; even if you felt that the facts and the evidence in the case justified the death penalty, would you refuse to impose the death penalty under any circumstances?
"(Two men raise their hands.)
"THE COURT: All right. What is your name, please?
"A MAN: Sylvester Jones.
"THE COURT: And you?
"A MAN: Guy D. Ward.
"THE COURT: Guy Ward?
"MR. WARD: Yes, sir.
 "MR. ADAMS: I am going to object to any exclusion of either of these two people.
 "THE COURT: All right. Let the Record show that Sylvester Jones and Guy D. Ward are excused. You two Gentlemen are excused. You may go. All right. Now, are there any questions for the State of Alabama, Mr. Sorrells?" (R.p. 90-91)
* * * * * *
(Second group of prospective jurors)
 "THE COURT: Would either of you Ladies and Gentlemen of the Jury Venire refuse to impose the death penalty regardless of the evidence that might be produced by the State of Alabama? Okay. We have a hand there. Now would either of you refuse to impose the death penalty under any circumstances, even if you felt the death penalty was justified by the facts and the evidence in the case?
"A LADY: (Raises her hand.)
"THE COURT: What is your name?
"A LADY: Sherry Allen.
 "THE COURT: Okay. Mrs. Allen, I am showing an objection for Mr. Adams. And Mrs. Allen, you are excused and you may take a seat back in the Court Room." (R.p. 110-111)
* * * * * *
(Third group of prospective jurors)
 "THE COURT: Would either of you Ladies and Gentlemen of the Jury Venire *Page 151 
refuse to impose the death penalty regardless of the evidence that might be produced by the State of Alabama?
"(Three Jurors respond.)
 "THE COURT: We have three hands there. Let me ask you this. Would either of you Ladies and Gentlemen refuse to impose the death penalty under any circumstances, even if you felt it might be justified by the facts and evidence produced by the State of Alabama?
"(All three respond again.)
 "THE COURT: Those same three hands. Now Mrs. Hanson, and this Gentlemen here _ _ _
"A MAN: Haber.
"THE COURT: And _ _ _
"A MAN: Holly.
"THE COURT: Holly?
"MR. HOLLY: Yes, sir.
 "THE COURT: Now you three are excused and may take seats in the Court Room.
 "MR. ADAMS: Judge, we except to the Court's Ruling on that." (R.p. 121-122)
* * * * * *
(Fourth group of prospective jurors)
 "THE COURT: Or would either of you refuse to impose the death penalty regardless of the evidence that might be produced by the State of Alabama in this case?
"(Several respond.)
 "THE COURT: Okay. Now if you will, keep your hands up those of you who answered positively to that question. Now this is to the entire panel. Would anyone of you refuse to impose the death penalty under any circumstances, even if you felt it was justified by the facts and the evidence in this case? In other words, even if you felt that the facts and the evidence produced by the State justified the death penalty being given, would you still refuse to give the death penalty?
"(Three people respond.)
"THE COURT: All right. That is the same three.
"A MAN: Mr. Tolar.
"A MAN: R.V. Johnson.
"THE COURT: And Mr. _ _ _
"A MAN: L.B. Boles.
 "THE COURT: Mr. L.B. Boles. All right. Now you three Gentlemen are excused.
"MR. ADAMS: Judge, we except to the Court's rule.
 "THE COURT: All right. The Defendant excepts, and you three Gentlemen may take seats back in the Court Room there." (R.p. 138-139)
It is clear from the trial court's examination that the prospective jurors would not impose the death penalty under any circumstances, even if they felt that the death penalty was justified by the facts and evidence in the case. The right to a representative jury does not include "the right to be tried by jurors who have explicitly indicated an inability to follow the law and instructions of the trial judge." Lockett v. Ohio,438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). We find no error in the exclusion of the prospective jurors. Boulden v.Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969);Witherspoon v. Illinois, supra; Hill v. State, Ala.Cr.App.,371 So.2d 60, remanded with directions, October 31, 1978, cert. den. State ex rel. Attorney General, Ala., 371 So.2d 64, January 19, 1979, Ala.Cr.App., 371 So.2d 64, remanded with direction, March 27, 1979, Ala.Cr.App., 371 So.2d 64, reversed and remanded, May 1, 1979; Wilson v. State, Ala.Cr.App.,371 So.2d 932 (1978), affirmed, Ala., 371 So.2d 943 (1979) (rehearing pending).
 II
The appellant contends that the trial court committed reversible error in denying his motion to replace the Parsons'
Rule[1] of insanity with the American Law Institute test for insanity. He contends that the Parsons' Rule is "antiquated and confusing" *Page 152 
and that the American Law Institute test would provide "adequate guidelines for the jury to determine the issue of insanity." The appellant contends that the new Alabama Criminal Code which goes into effect June 1, 1979[2] adds evidence to his argument since the American Law Institute test for insanity is there adopted as the law of Alabama in § 13A-3-1, Code of Alabama 1975.[3]
He also cites numerous other state and federal jurisdictions that have adopted the American Law Institute test.
In the case of Johnson v. State, 56 Ala. App. 105,319 So.2d 725 (1975) it is stated:
 "Notwithstanding the changes in some other jurisdictions, and the many suggested changes in substantially all jurisdictions, of the rule that sets forth the mental capacity to commit a crime, the Alabama rule is still that M'Naghten's Case, 8 Eng. Rep. 718 (H.L. 1843) as supplemented by Parsons v. State, 81 Ala. 577, 2 So. 854 (1886), a person of requisite age is mentally capable of criminal conduct unless his mind is so diseased that either he cannot distinguish between right and wrong as to the particular offense in question or he cannot resist an impulse to commit such offense if solely produced by his mental disease. We are not authorized to change that rule. . . ."
The recent case of State v. Bracewell, Ala., Ms., May 25, 1979, held that the law in effect at the time of the commission of the offense governs "the offense, the offender, and all proceedings incident thereto." The Parsons' Rule is still the law in Alabama. Moore v. State, Ala.Cr.App., 364 So.2d 411, cert. den., Ala., 364 So.2d 416 (1978); Carey v. State, Ala.Cr.App., 361 So.2d 1176 (1978).
 III
The appellant submits that the trial court committed reversible error by admitting into evidence his extra-judicial confessions. He contends that the confessions were not voluntarily made and that he did not intelligently waive his right to have an attorney present at the interrogation. The appellant admits in his brief that he was advised of his rights as set forth in Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), but that he did not execute a valid waiver of his right to counsel because he was never told with what crime he was charged nor was he told what the maximum or minimum punishment was that he could receive for the crime for which he was charged.
 A
In the determination of whether a confession is voluntary we must look at the totality of the circumstances surrounding the giving of the confession. Sullivan v. State, Ala.Cr.App.,351 So.2d 659, cert. den. Ala., 351 So.2d 665 (1977); therefore, a short review of the sequence of events concerning the statements made by the appellant is in order.
On October 7, 1977, at approximately 1:30 a.m., Deputy Frankie Pascal visited the appellant at Flowers Hospital. The appellant had been treated by Dr. Joe Sugg for a minor gunshot wound in the shoulder. At this time Deputy Pascal warned the appellant of his Miranda rights, but did not take a statement. The appellant was also visited at the hospital a little after 2:00 a.m. by Deputy Leroy Wood. Deputy Wood also advised the appellant of his Miranda rights and the appellant signed a waiver of rights *Page 153 
form. No statement was taken from the appellant at this time and he was taken to jail.
At the jailhouse the appellant was again advised of hisMiranda rights by Lieutenant Joe Pitts. The appellant was told by Lieutenant Pitts that he was under arrest and that he was a suspect and was being investigated for crimes that had been committed at his home. At approximately 3:20 a.m. a statement lasting approximately eighteen minutes was taken of the appellant. In the statement the appellant accused a masked man and his sister-in-law, Beverly Hughes Crawford, of committing the murders. This statement was introduced into evidence. At approximately 4:00 a.m. the appellant was taken out of his cell to identify a person the deputies thought might be the sister of the appellant, Brenda Peters. The subject was not Mrs. Peters. Mrs. Peters, who had been reported missing, was later found dead. While the appellant was out of his cell he gave Lieutenant Pitts another statement concerning the masked man. The appellant was not advised of his Miranda rights during this time. This statement was also introduced into evidence.
The next day, October 8, 1977, the appellant was advised of additional charges placed against him. The appellant stated that he wanted to talk to the investigators, he was warned of his Miranda rights, and he signed a waiver of rights form at approximately 2:45 p.m. At approximately 5:30 p.m. a statement was taken from the appellant wherein he admitted to the murders. This statement was introduced into evidence.
On October 9, 1977, no statements were taken from the appellant nor was he advised of any constitutional rights. On this day, deputies explained the preliminary hearing court procedures to him.
On October 10, 1977, the appellant requested to see Lieutenant Pitts and the Sheriff. At this time, he was warned that his constitutional rights were still in effect and he was specifically told that he had the right to remain silent and the right to assistance of counsel. The appellant then gave a statement concerning the location of the murder weapon. This was also introduced into evidence.
Extensive voir dire examinations were conducted during the trial concerning the admission into evidence of the four statements of the appellant. The appellant was warned of his constitutional rights no less than five times and he signed no less than two waiver of rights forms. The appellant was not threatened or coerced to make any statements, nor was he offered any promises or rewards to talk. The testimony showed that he was a high school graduate and had attended one year of college; this indicates fair intelligence.
The appellant contends that his statements were not given freely and voluntarily because he was continuously interrogated, he was not warned of his rights each and every time he was questioned, some of the deputies present during the questioning were in uniform and wearing a gun, the interrogation office was 18' X 20', and that he was suffering from a wound in the shoulder during all of this.
The evidence presented shows that the appellant was questioned over a period of days and he was not continuously questioned. There was no evidence presented to the point that the appellant was intimidated or coerced into giving statements because of deputies being in uniform and wearing guns, nor was there evidence that the size of room was intimidating. Thomasv. State, 257 Ala. 124, 57 So.2d 625 (1952); McClendon v.State, 54 Ala. App. 327, 307 So.2d 723 (1975).
The testimony of Dr. Sugg was that the wound on the appellant was a minor wound and that the evidence pointed toward it being self-inflicted.
There is no requirement that Miranda warnings be given before each separate interrogation. Johnson v. State, 56 Ala. App. 583,324 So.2d 298, cert. den. 295 Ala. 407, 324 So.2d 305 (1975). In this case the only time that the appellant was not warned of his rights was during questioning *Page 154 
less than one hour after he had previously been warned of his rights.
The duty of determining the voluntariness of a confession is within the sound discretion of the trial court. Fitzhugh v.State, 35 Ala. App. 18, 43 So.2d 831, cert. den. 253 Ala. 246,43 So.2d 839, cert. den. 339 U.S. 986, 70 S.Ct. 1007,94 L.Ed. 1388 (1950). We find no error on the part of the trial court in the admission into evidence of the extra-judicial confession of the appellant. North Carolina v. Butler, 441 U.S. 369,99 S.Ct. 1755, 60 L.Ed.2d 286.
 B
The argument by the appellant that he must be advised of the exact offense or charge against him before he can knowingly and intelligently waive right to counsel and make a voluntary statement is without merit. There is no requirement set forth in Miranda that this be done. Jemison v. State, 49 Ala. App. 289, 270 So.2d 836 (1972). This Court also rejects the contention, for the same reasons, that the possible range of sentence to be inflicted on the appellant must be made known before an effective waiver of rights can be made.
 IV
After a hearing was held out of the presence of the jury, Donald Welch was allowed to testify concerning certain incriminating statements made to him by the appellant while both were prisoners in the Houston County Jail. These statements were made to Welch less than two weeks before the appellant's trial. Lieutenant Joe Pitts was also allowed to testify concerning the incriminating statements. Welch had been equipped with a radio monitoring device that enabled Lieutenant Pitts to listen to the conversation between Welch and the appellant. Lieutenant Pitts' testimony corroborated the testimony of Welch.
The appellant contends that the testimony of Welch and Lieutenant Pitts should have been excluded from evidence under the authority of Massiah v. United States, 337 U.S. 201,84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). He claims that the admission of this testimony was a violation of his federal Sixth Amendment right to assistance of counsel, when the incriminating statements were made after he had been indicted and had been appointed counsel. We do not think the rule enunciated in Massiah, supra, is all encompassing.
The circumstances in this case are clearly distinguishable from those presented in Massiah v. United States, supra. In theMassiah case he and one Colson were indicted for violating the federal narcotics law. Massiah retained a lawyer, pleaded not guilty, and was released on bail, along with co-defendant Colson. Colson was recruited by government agents as an informer to aid them in their continuing investigation of Massiah. Colson was equipped with a radio transmitter and proceeded to engage Massiah in a conversation about their narcotics activities while a government agent listened via a radio receiver. Massiah made several incriminating statements, the government agent testified at trial to those statements, and Massiah was convicted. The United States Supreme Court reversed the conviction, holding that Massiah had been denied the right to assistance of counsel "when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel". 377 U.S. 206,84 S.Ct. 1203. The United States Supreme Court went on to say: "All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial."377 U.S. 207, 84 S.Ct. 1203. In a more recent United States Supreme Court decision, Brewer v. Williams, 430 U.S. 387,97 S.Ct. 1231, 51 L.Ed.2d 424 (1977), it was stated that "the clear rule of Massiah is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him". 430 U.S. 401,97 S.Ct. 1240. This statement does not add to *Page 155 
or subtract from the right to assistance of counsel as delineated in Miranda, supra.
In the case at bar Welch was first approached by the appellant on July 12, 1978, less than two weeks before the appellant's trial was to begin. At this meeting the appellant solicited Welch to arrange the death of the chief witness against him in his trial in return for a fee of ($3,000.00) three thousand dollars. The appellant stated to Welch that the witness was his sister-in-law, Beverly Hughes Crawford, and gave Welch a map with directions to her house. The appellant wanted her killed after she had copied and signed a suicide note that he had written. She would admit to the killings herself in the suicide note thereby exonerating the appellant. After thinking the proposition over for a few hours, Welch contacted Sheriff Clark, told him about the offer, and turned the map over to the Sheriff.
Welch volunteered to aid in the investigation of the appellant's attempt to suppress the testimony of the State's witness, Beverly Hughes Crawford. Welch testified that he was offered no promises other than protection and that he was told not to investigate anything other than the attempt to suppress the witness's testimony.
Welch met with the appellant again on July 14, 1978, and was given the suicide note. He turned the note over to the District Attorney. On July 15, 1978, Welch was to meet the appellant in the dayroom of the Houston County Jail to play dominoes and to discuss further the offer to kill Beverly Hughes Crawford. Welch agreed to wear a radio monitoring device so that Lieutenant Pitts could hear the conversation between the appellant and himself. Welch testified that at this meeting the appellant told him that he wanted Beverly Hughes Crawford killed before his trial started, that she was the only witness against him and without her they would probably "let the trial go." He also testified that the appellant said the one thing that would convict him would be Beverly because she was "the only one that could really hurt him, identify him as shooting them." The appellant told Welch that he had talked with Harley Davis, another prisoner in the Houston County Jail, about hiring Davis to have Beverly killed, but the deal fell through when Davis was sent to another jail. The appellant had also tried to hire someone from Mobile to kill the witness but had been ripped off on that deal.
The July 15, 1978, meeting between Welch and the appellant was the only meeting where Welch wore a radio monitoring device. Lieutenant Pitts' testimony about the conversation between Welch and the appellant only concerned the July 15 meeting.
On July 22, 1978, the appellant gave Welch the title to his Ford pickup truck to ensure payment. Welch showed this to Lieutenant Pitts and later returned it to the appellant.
Harley Davis was also called to testify for the State. He said that the appellant had offered him ($3,000.00 to $5,000.00) Three Thousand to Five Thousand Dollars to arrange to have Beverly Hughes Crawford killed. The appellant also agreed to make Davis' bond. Davis testified that the appellant wanted it to look like suicide. After Davis was transferred to another jail out of town, the appellant wanted to know if Davis could still get the job done. Davis told appellant that he would try. Davis testified that the appellant arranged for his wife to receive ($75.00) Seventy-Five Dollars to help with his court costs. Davis testified that he in fact knew a man in Michigan that might do the job, but that he had never contacted him about doing it.
The differences in the Massiah case and this case are readily apparent. In Massiah there was an ongoing, continuing investigation of the crime for which Massiah was under indictment. Massiah's co-defendant, Colson, who was charged under the very same indictment as Massiah, was the informant. Colson purposely engaged Massiah in conversation about their narcotics crimes so that the federal agents could obtain more information. This was in fact an illegal interrogation about the crime for which he *Page 156 
was charged. At Massiah's trial only the federal agent testified about the incriminating statements made by Massiah.
In the present case we are talking about a completely new and different investigation of the appellate separate and apart from the crime charged in his indictment. The law enforcement authorities knew nothing about the appellant's attempts to have a State's witness killed until it was brought to their attention by a volunteer informant who was in no way connected with the crime for which the appellant was under indictment. The witness Welch testified himself as to the conversation with the appellant. Lieutenant Pitts' testimony only concerned one of the meetings. In addition, witness Davis also testified to being contacted to kill the witness, Beverly Hughes Crawford. The most important difference in the cases is that in theMassiah case the government agents initiated the conversation between Massiah and Colson. In this case the appellant is the one who initiated the conversation. At no time during their conversation was there any indication of trial tactics to be used in the appellant's upcoming trial. Police are under a duty to investigate and attempt to prevent completion of crimes; especially when a life is at stake. To hold that the use of a volunteer informant in the investigation of a crime in progress is an illegal interrogation of a defendant would unduly restrain the basic duty of law enforcement. We do not think the Sixth Amendment confers the right to assistance of counsel during the commission of a crime. United States v. Merritts,527 F.2d 713 (7th Cir. 1975). To paraphrase a part of the opinion in Deskins v. Commonwealth, Ky., 512 S.W.2d 520, cert. den. 419 U.S. 1122, 95 S.Ct. 806, 42 L.Ed.2d 822 (1975):
 ". . . The [State] need not sit idly by when it is discovered that a defendant, under indictment, and represented by counsel is undertaking to [suppress testimony]. In an orderly society there can be no question that individual constitutional rights are not broad enough to allow one charged with crime a license to poison the very foundation of the judicial process. [The appellant] was not at liberty to personally, or through counsel, subvert the judicial process itself. . . ."
As stated in Bynum v. State, Ala.Cr.App., 348 So.2d 804, writ quashed, Ala., 348 So.2d 828, cert. den. 434 U.S. 1034,98 S.Ct. 766, 54 L.Ed.2d 781 (1978); quoting Gassenheimer v.State, 52 Ala. 313:
 "[W]hen the offense charged and the offense proposed to be proved are so connected that they form part of one transaction; when it is material to show the intent with which the particular act charged as criminal was done, evidence of another similar act, though it was in itself a criminal offense, may be given . . .".
According to Gamble, McElroy's Alabama Evidence, § 190.02: "The general rule is that a party's attempt to suppress evidence is admissible against him. . . ." We think the testimony of Welch and Lieutenant Pitts was properly "admissible as revealing a consciousness of guilt because of the apparent attempt to suppress evidence." Curtis v. State, 44 Ala. App. 63,202 So.2d 170 (1967).
Finally, quoting from Milton v. Wainwright, 407 U.S. 371,92 S.Ct. 2174, 33 L.Ed.2d 1 (1972), (case in which an officer posed as a cellmate):
 ". . . Assuming, arguendo, that the challenged testimony should have been excluded, the record clearly reveals that any error in its admission was harmless beyond a reasonable doubt. [Citations omitted] The jury, in addition to hearing the challenged testimony, was presented with overwhelming evidence of petitioner's guilt, including no less than three full confessions that were made by petitioner prior to his indictment. . . ."
 407 U.S., at pages 372-373, 92 S.Ct., at pages 2175-6.
As stated earlier the appellant was advised of his constitutional rights no less than five times and he signed no less than two waiver of rights forms. There were four statements admitted into evidence that were made by the appellant. Two of these *Page 157 
statements were confessions. After reviewing the record we are left with no reasonable doubt that the jury would have reached the same verdict without the testimony of Welch and Lieutenant Pitts. Milton v. Wainwright, supra, Rule 45, Alabama Rules of Appellate Procedure.
 V
On October 31, 1977, at the request of the appellant, District Judge Sheffield of Houston County issued a court order for the appellant to undergo psychiatric testing and examination at the Wiregrass Mental Health Clinic in Dothan, Alabama. On November 7, 1977, the appellant signed a release of information form concerning results of the psychiatric examination performed by Dr. Fernando Lopez and results of the psychological evaluation conducted by Dr. Doug McKeown. Dr. McKeown testified as a State's witness at the appellant's trial.
The appellant contends that the testimony of Dr. McKeown came under the psychologist-client privilege of Title 46, § 297 (36), Code of Alabama 1940, 1973 supplement (now § 34-26-2, Code of Alabama 1975).[4] He claims that the admission of this testimony at trial constituted reversible error.
On December 9, 1977, at the appellant's request, Circuit Judge White issued a court order sending the appellant to the State Hospital for the Insane at Mt. Vernon, Alabama, to undergo a mental examination. The appellant's defense at trial was insanity and he called as his witnesses two psychologists and a psychiatrist who examined him at Mt. Vernon. The State called as a rebuttal witness Dr. McKeown.
The appellant waived any right he may have had under the psychologist-client privilege by signing a release of information waiver and by calling as defense witnesses other psychologists who examined him under court order. As stated inDay v. State, Ala.Cr.App., ___ So.2d ___, February 20, 1979: ". . . To hold otherwise would allow a defendant to call only those psychologists and psychiatrists he desired and then on a claim of privilege communication object to the testimony of the State's experts who examined him for the same purpose. This he cannot do."
Additionally, since the psychologist-client privilege is put on the same basis as the attorney-client privilege we quote Gamble, McElroy's Alabama Evidence, § 392.04, where it is stated:
 "The attorney-client privilege does not cover statements which are intended to be communicated to third persons. Such an intent is said to deprive the statement of any confidential status."
The results of the psychological examination were to be reported to the court.
 VI
The appellant's final contention is that the sentencing scheme of the Alabama death penalty statute[5] as applied to this particular case was an unconstitutional violation of the Eighth and Fourteenth Amendments to the United States Constitution. He claims that this violation resulted in a standardless imposition of the death penalty.
The Alabama Supreme Court has held that Alabama's sentencing scheme in death cases comports with the constitutional standards outlined in Locket v. Ohio, 438 U.S. 586,98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Jacobs v. State, Ala.,361 So.2d 640 (1978).
No evidence has been presented to this Court nor do we find any evidence that the sentencing hearing in this case was conducted unconstitutionally. The appellant was presented the opportunity to present *Page 158 
any evidence of mitigating circumstances and the opportunity to present any argument against the sentence of death. In addition, he was asked twice if he had any further evidence to present. He was also asked if he had anything to say as to why the sentence should not be pronounced upon him. The trial court also considered and incorporated into the record an independent pre-sentence investigation performed by the probation officer of Houston County, Alabama. The Alabama Supreme Court has stated that this is an element needed to obtain a full picture of the defendant. Cook v. State, Ala., 369 So.2d 1251 (1978). In view of the foregoing we believe that the appellant was given a fair and constitutional sentencing hearing. Evans v.State, Ala.Cr.App., 361 So.2d 654 (1977).
The appellant also contends that the aggravating circumstances found by the trial court were not supported by the evidence.
The following aggravating circumstances were found by the trial court: ". . . (1) that the defendant knowingly created a great risk of death to many persons (2) the Capital felony was committed for pecuniary gain (3) the Capital felony was especially heinous, atrocious or cruel. . . ." The only mitigating circumstances found by the trial court to exist was "that the defendant has no significant history of prior criminal activity" (Vol. 6, R. pp. 1188-89).
First, the evidence showed that the appellant killed three persons and seriously wounded three others. The testimony also showed that the appellant chased one of the victims in an automobile on a public highway at speeds estimated to be eighty miles per hour. Second, the testimony of Steve Lynn Langley was that the appellant stated that he was going to take over the farm. Other testimony showed (including the pre-sentencing report) that the appellant did not get along with his father and other members of the family. The testimony showed that there were no plans for him to take over the farm, and there were no plans for his father to retire. The appellant was employed elsewhere and only worked on the farm sporadically. Third, the appellant's counsel, at the sentencing hearing, stated that: ". . . And we would submit, I will say Tim Crawford would say that this crime was a heinous crime. There is no doubt about that. . . ." Dead at the hands of appellant were: (1) the appellant's niece, Chris Peters, a six year old child, shot twice, with one of the shots resulting from the barrel of the rifle having been held next to her body; (2) the appellant's sister, Brenda Peters, shot four times, her two small children (Devana and Eddie) were left hovering over their dead mother's body overnight in a field before they were found; (3) the appellant's father, Eddie Roy Crawford, shot twice, and found in an old truck body used as a peanut dryer; the evidence indicated that he never knew what hit him. The victims who survived were subjected to multiple gunshot wounds. His brother, Charles, was shot in the back, paralyzed and left to die in the woods. His sister-in-law, Beverly, was shot in her own home, shot while she was trying to get away in her automobile and chased down the highway. The appellant's mother was shot down in her own home.
The aggravating circumstances found by the trial court were more than supported by the evidence.
The appellant contends that the following mitigating circumstances under Title 15, § 342 (9), Code of Alabama 1940, 1975 supplement (now § 13-11-7, Code of Alabama 1975), should have been found by the trial court:
 "(2) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance;
 "(6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired."
The jury found the appellant not to be insane. The trial judge independently considered the contentions of the appellant concerning the aggravating and these mitigating *Page 159 
circumstances and found against the appellant on these points.[6]
This Court has also weighed the aggravating and mitigating circumstances separately and finds the trial court correctly determined these matters.
The judgment is due to be affirmed. An execution date will not be set pending appeals.
AFFIRMED.
All the Judges concur.
[1] Parsons v. State, 81 Ala. 577, 2 So.2d 854 (1886).
[2] Effective date delayed to January 1, 1980, Act No. 125, 1979 Regular Session.
[3] (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.
 (2) "Mental disease or defect" does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.
 (3) Lack of criminal responsibility under this section is a defense. (Acts 1977, No. 607, § 501.)
[4] "For the purpose of this chapter, the confidential relations and communications between licensed psychologist and client are placed upon the same basis as those provided by law between attorney and client, and nothing in this chapter shall be construed to require any such privileged communication to be disclosed."
[5] Title 15, § 342 (5) — § 342 (9), Code of Alabama 1940, 1975 supplement (now § 13-11-3 through § 13-11-7, Code of Alabama 1975).
[6] See Appendix A.
 APPENDIX A
"September 1, 1978 — The Court proceeding to hear evidence and argument from the State as to aggravating circumstances which it feels are the basis for upholding the Jury's Verdict of death and also evidence and argument from the Defendant as to Mitigating Circumstances which he feels should serve as a basis to reject the Jury's Verdict of punishment by death, as well as an independent pre-sentence investigation performed by the Probation Office of Houston County, Alabama, the Court finds the following aggravating circumstances exist (1) That the Defendant knowingly created a great risk of death to many persons (2) The Capitol felony was committed for pecuniary gain (3) The Capitol felony was especially heinous, atrocious or cruel. The Court finds that the defendant premeditatedly, maliciously and intentionally killed the deceased persons named in the Indictment and attempted to kill three others on October 6, 1977, and that he then attempted to have a witness against him killed just prior to his trial in this cause. The Court finds the only Mitigating Circumstance which exists is that the Defendant has no significant history of prior Criminal activity. The Court finds this Mitigating Circumstance insufficient to out-weigh the aggravating Circumstances and therefore no basis to reject the Jury's Verdict of death and impose a life sentence in prison without parole.
 "/S/ Jerry M. White, Judge
20th Judicial Circuit of Alabama"