639 P.2d 1020

STATE of Arizona, Appellee,

v.

Ignacio Alberto ORTIZ, Appellant.

No. 4818.

Supreme Court of Arizona,
In Banc.

Nov. 23, 1981.

Rehearing Denied Jan. 12, 1982.

Robert K. Corbin, Atty. Gen., William J. Schafer, III, Chief Counsel, Crim. Div., Jack Roberts, Asst. Atty. Gen., Phoenix, for appellee.

Richard S. Oseran, Pima County Public Defender, Donald S. Klein, Asst. Public Defender, Tucson, for appellant.

GORDON, Justice:

On July 2, 1979, a jury found appellant guilty of one count of first degree murder, three counts of attempted first degree murder,[1] two counts of aggravated assault, one count of arson of an occupied structure, one

---

1. The jury also found that these crimes involved the use or exhibition of fire, a dangerous instrument under A.R.S. § 13–604.

count of first degree burglary, and one count of conspiracy to commit first degree murder. Following an aggravation-mitigation hearing on October 4 and 5, 1979, appellant was sentenced on October 15, 1979. The trial judge imposed the death penalty for the first degree murder conviction, life imprisonment for the conspiracy conviction, and the maximum sentence on each of the other charges, to run concurrently with each other and consecutively to the conspiracy sentence. Appellant now challenges the convictions on all counts and the sentence of death. We have jurisdiction pursuant to A.R.S.Const. Art. 6, § 5(3) and A.R.S. § 13–4031, and we affirm.

Appellant and his wife were the godparents of Manuelita and Charles McCormack, Jr.'s youngest child, Charles McCormack III. The McCormacks also had two daughters, Patricia and Bernice. At the time of the charged crimes, Patricia was nine years old, Bernice was eight, and "Baby Charlie" was three.

Charles and Manuelita McCormack were having marital difficulties in 1977–78. They had separated and Manuelita had considered filing for a divorce. During these difficulties, appellant saw Manuelita often and helped her and the children. There is some suggestion in the record that the relationship between appellant and Manuelita turned into a love affair. Manuelita and Charles reconciled, however, and Charles moved back into the house.

Appellant continued to visit Manuelita after the reconciliation but would do so only when Charles was not home. Appellant drove a white pick-up truck with a camper shell which a neighbor saw on several occasions parked in the alley behind the McCormack residence. Apparently, Manuelita tried to discourage his visits and eventually told him not to visit or telephone her anymore.

These events built to a climax on the evening of December 21, 1978. According to the testimony of Bernice and Patricia McCormack, the children went to bed that night in Patricia's bedroom around 9:00 p. m. Charles McCormack, Jr. testified that

he left for work at about 10:00 p. m. A neighbor said she saw appellant's truck in the alley at 11:00 p. m.

During the night, Baby Charlie woke up and asked Bernice for a glass of water. Bernice testified that when she went to get a glass of water from the kitchen, she saw "Nacho," the nickname by which she knew appellant, and her mother on the living room floor. Her mother appeared to be sleeping, and appellant had his hands around her mother's neck. Bernice returned to the bedroom and awoke Patricia.

Shortly thereafter, appellant entered the bedroom and told the children that he was going to call an ambulance for their mother. Appellant left the room, and the children played with some clay. An ambulance never arrived, but appellant returned and told Patricia that her mother wanted to see her. Patricia went to the living room, whereupon appellant grabbed her from behind and stabbed her in the chest with a knife. Patricia, screaming, ran into her mother's bedroom and collapsed on the bed.

When Bernice heard the screams, she ran to her mother's bedroom to investigate. Appellant also grabbed her from behind and used the knife to stab her in the chest. Bernice ran back to Patricia's bedroom where Baby Charlie was still playing. Patricia testified that sometime during these events she thought she heard her mother plead, "Please don't hurt Baby Charlie."

Appellant had brought a can of gasoline with him to the McCormack residence. He poured gasoline on Manuelita and over the exit from the bedrooms. He also placed a delayed ignition device on a pile of clothes at the foot of Baby Charlie's bed. On his way out of the house, he told the children not to leave until the fire department arrived. Then he ignited the gasoline and departed.

Within a short time, Bernice smelled smoke. She rose from the bed where she lay, gathered Baby Charlie and Patricia, and helped them out of the house. Bernice and Baby Charlie struggled to a neighbor's house; Patricia collapsed on the sidewalk,

and when the paramedics found her, she was near death.

The fire engulfed the living room before the fire fighters arrived and put it out. Manuelita's body had been badly charred. The pathologist found stab wounds in her neck and, judging from the pool of blood discovered under her body, deduced that she had been stabbed in the chest. Her chest was too burned to find any stab wounds, however. Although he found the cause of death to be stabbing, the pathologist testified that Manuelita may have been alive when the fire started.

The next day, appellant was arrested and jailed. While awaiting trial on the charges relating to the events of December 21, he moved in with another prisoner named Jose Alvarez. Alvarez was in jail pending a trial on numerous robbery charges and had a history of drug abuse. He had also tried to escape from the jail and severely injured a knee in the attempt. Several weeks after they were put together, Alvarez was taken to the hospital for knee surgery.

When he got to the hospital, Alvarez contacted the Pima County Attorney's Office. He told them that appellant had offered him $10,000 to kill the three children, their father, their father's girlfriend, and Manuelita's sister with whom the children were staying. Alvarez was supposed to escape from the hospital and commit the murders. Alvarez also said that appellant had confessed in detail to the murder of his "comadre."[2]

Alvarez agreed to help the county attorney's office with further investigation. He implicated appellant's wife in the conspiracy, and also made a telephone call, taped by the investigators, to appellant at the jail. Subsequently, appellant and his wife were indicted for conspiracy to commit first degree murder. The county attorney's office made a plea offer to Alvarez on the robbery charges in return for his testimony, under immunity, against appellant. Alvarez accepted.

The conspiracy charge was originally to be tried separately from the charges relating to the murder; appellant was appointed the same attorney for both cases. Trial counsel was a private attorney who had been paid only part of his retainer before appellant became indigent. Trial counsel agreed to accept appointment with partial retainer considered as part payment from the county for his work on the case.

A motion in limine was filed in the murder case to preclude all evidence of the conspiracy. When the motion was denied, trial counsel moved to join the trials, and this motion was granted.

The trial lasted two and one-half weeks. Appellant's defense to the murder related charges was alibi. His defense to the conspiracy charge was that Alvarez decided to help appellant by eliminating the witnesses against appellant and coerced appellant to help him through threats of physical force. The jury rejected both defenses and convicted appellant of all counts.

Appellant obtained new counsel for his automatic appeal to this Court. The following issues are raised:

(1) Did the trial court err in telling the venire that all teachers and students would be excused at their request?;

(2) Was trial counsel's assistance ineffective?;

(3) Should the trial court have granted a mistrial when the prosecutor asked a child witness if she was afraid of anyone and she replied she was afraid of appellant?;

(4) Did the trial court err when it instructed the jury that it could convict for conspiracy if it found appellant conspired against any of the six people named in the indictment?;

(5) Can appellant's conspiracy conviction stand when all of his coconspirators have been acquitted or have immunity from prosecution?;

(6) Is the death penalty sentencing procedure in Arizona constitutional?; and

(7) Was the death penalty properly imposed in this case?

2. The mother of a child is the "comadre" of that child's godfather in Mexican culture.

## JURY SELECTION

During voir dire, the trial judge told the jury panel the trial might last three weeks and, "Any student or any teacher who is teaching, if they want to go, they may." Based on the right to a jury panel representing a cross-section of the community, appellant claims the court erred by granting such a blanket excusal. At trial, however, appellant passed the panel without objection.

We find *State v. Arnett*, 119 Ariz. 38, 579 P.2d 542 (1978) dispositive.

"A defendant in a criminal case is entitled to a fair and impartial jury for the trial of his case, but he is not entitled to be tried by any particular jury; therefore, unless the record affirmatively shows that such a fair and impartial jury was not secured, the conviction must be affirmed. * * * Our review of the record has disclosed no evidence that the jury which heard this case was not fair and impartial, nor has appellant directed us to any such evidence. Ordinarily, the matter of excusing jurors is committed to the sound discretion of the trial judge, and in the absence of a clear and prejudicial abuse of that discretion, his action will not be disturbed on appeal; this is so even where the judge acts on his own motion. * * * We further note that appellant waived any objection in this regard, both by failing to object at the time of the excusal * * * and by expressly approving the panel at the conclusion of voir dire * * *."

*Id.* at 50, 579 P.2d at 554 (citations omitted).

In the instant case, appellant passed the jury panel at trial without objecting to its composition; therefore, any objection was waived on appeal. We note that this is not a case where a class of potential jurors was precluded from serving on any venire as in *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), or *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Rather, members of a class of jurors were permitted to decline to serve in this case because of the substantial hardship service would cre-

ate. Furthermore, we find no evidence that appellant was denied a fair and impartial jury.

## ASSISTANCE OF COUNSEL

The Sixth and Fourteenth Amendments of the United States Constitution guarantee a criminal defendant the right to effective assistance of counsel. Appellant claims that his trial counsel was ineffective in five areas. We consider each separately.

1. *Trial counsel moved to join the conspiracy trial to the murder trial.*

When trial counsel's motion in limine to preclude evidence of the conspiracy at the murder trial failed, he moved to join the conspiracy to the murder trial. Appellant was convicted of the conspiracy at the time he was convicted of the murder; the conspiracy conviction was thereafter used as an aggravating circumstance in sentencing appellant to death on the murder charge. See A.R.S. § 13–703(F)(1). Appellant urges us to find trial counsel's assistance to be ineffective concerning this matter. We note that the only possible prejudice to appellant from joinder was in the use of the conspiracy conviction as an aggravating circumstance. The trial court had held that the evidence used to prove the conspiracy would be admissible at the murder trial to prove consciousness of guilt of the murder. Because we hold below that the conspiracy conviction as a matter of law does not fit within the language of A.R.S. § 13–703(F)(1), we need not consider the merits of this issue.

2. *Taped conversation between appellant and Alvarez*

Before reaching the merits of appellant's argument, we find it necessary to discuss what standard to apply in determining whether counsel's assistance has been ineffective. The present test in Arizona for ineffective assistance of counsel is whether "the representation by a defendant's lawyer was so ineffective that the proceedings were reduced to a farce, sham or mockery of justice." *State v. Williams*, 122 Ariz. 146, 150, 593 P.2d 896, 900 (1979). Appel-

lant urges us to abandon that standard in favor of the Ninth Circuit Court of Appeals' "reasonably competent and effective representation" standard. *See, e.g., Cooper v. Fitzharris,* 586 F.2d 1325 (9th Cir. 1978), *cert. denied,* 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979). As noted in *Williams,* the farce, sham, or mockery standard has come under increasing attack, and one member of our Court has explicitly suggested abandoning it in favor of the Ninth Circuit standard. *See Williams,* 122 Ariz. at 154–55, 593 P.2d at 904–05 (specially concurring opinion). But regardless of the standard we apply to appellant's case, we find trial counsel's assistance effective.

After appellant had confessed the murder to Alvarez and after he had solicited Alvarez' help in the plot to murder the witnesses against him, Alvarez contacted the county attorney's office while at the county hospital for knee surgery. This was the first notice of the conspiracy received by law enforcement personnel.

Two county attorneys, who were the prosecutors for appellant's murder charges, an investigator from the county attorney's office, and a detective from the Tucson Police Department, who had investigated the murder charges, met with Alvarez at the hospital. They had Alvarez, during his stay at the hospital, call appellant at the jail, and they taped the conversation with Alvarez' consent. The conversation, which concerned only the conspiracy, was admitted into evidence at trial.

The parties do not dispute that at the time of the taped conversation, Alvarez was working as a government agent. Further, appellant at this time had been indicted only for the murder charges but not the conspiracy. Counsel had been appointed to represent him on the murder charges.

■ Appellant argues that trial counsel failed to render effective assistance of counsel in that he did not object to admission of the taped statement on the basis of *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). *Massiah* held that a defendant's Sixth Amendment right to counsel is violated when, after indictment, the police obtain incriminating statements, directly or through agents, from the defendant without defense counsel's permission. Such statements are subject to an exclusionary rule.

The United States Supreme Court recently applied *Massiah* in *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). In that case, the Court held that the Sixth Amendment is also violated when the police use a paid informant-prisoner to surreptitiously elicit incriminating information from a jailed defendant when the information deals with the crime for which the defendant is being held. *Accord State v. Berry,* 592 S.W.2d 553 (Tenn.1980), *cert. denied,* 449 U.S. 887, 101 S.Ct. 241, 66 L.Ed.2d 112 (1981). *Henry* found *Massiah* applied whether the informant actively interrogated the defendant or merely engaged in conversation.

What distinguishes the instant case from *Massiah* and *Henry* is that the information elicited concerned only crimes for which the appellant had not yet been indicted. Because appellant had not yet been indicted for conspiracy, his Sixth Amendment right to counsel had not yet attached for the conspiracy charge. Therefore, if the taped conversation had been admitted at a trial where conspiracy was the only charge, there would have been no Sixth Amendment violation. *See United States v. Hinton,* 543 F.2d 1002 (2d Cir.), *cert. denied sub nom. Carter v. United States,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976); *United States v. Boffa,* 89 F.R.D. 523 (D.Del.1981); *United States v. Diamond,* 492 F.Supp. 583 (D.Md.1980); *United States v. Rosner,* 352 F.Supp. 915 (S.D.N.Y.1972), *aff'd,* 516 F.2d 269 (2d Cir. 1975).

■ The problem in the instant case, however, is that although the taped statement was used to prove the conspiracy, the conspiracy was used to prove consciousness of guilt of the murder.[3] The issue before

---

**3.** In fact, trial counsel moved for joinder of the conspiracy to the murder charges only after the

trial judge ruled that evidence of the conspir-

us, then, is whether a Sixth Amendment violation occurs when a police agent surreptitiously elicits information from an indicted defendant if the information concerns an unindicted charge but is used to prove the indicted charge. We hold that under *Massiah* and *Henry*, there is a Sixth Amendment violation when this situation occurs.[4]

We realize that the police have a need to investigate ongoing crime. Further, we note that there is no right to counsel while perpetrating a crime. The purpose of the Sixth Amendment's right to counsel is to protect a client's constitutional rights, not to conceal crimes as the client commits them. Hence, we find no Sixth Amendment error in the police eliciting incriminating information on uncharged crimes from a defendant who is without the benefit of counsel. But we hold that the state may not subsequently use that information to prove a crime for which the defendant's right to counsel had attached at the time the information was elicited. It does not matter whether the state, when it gathered the information, intended to use it to prove the unindicted or the indicted crimes. The Sixth Amendment right to counsel does not turn on the state's motives. "Anything less * * * might deny a defendant 'effective representation by counsel at the only stage when legal aid and advice would help him.'" *Massiah*, 377 U.S. at 204, 84 S.Ct. at 1202, 12 L.Ed.2d at 249.

By allowing admission of the conversation with Alvarez, who then was a government agent,[5] to prove a crime for which his client's right to counsel had attached, trial counsel erred. But although we disapprove of trial counsel's conduct in this regard, we do not find his assistance ineffective.

 When an attorney's conduct does not prejudice the defendant, the attorney's assistance is not ineffective under either the farce, sham, or mockery standard or the reasonably competent criminal attorney standard. We do not find reversible error under the particular facts of this case; hence, we do not find trial counsel's assistance ineffective. Even though appellant's Sixth Amendment right to counsel was infringed by admission of the conversation, constitutional error is not reversible if it is harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The error in the instant case was harmless beyond a reasonable doubt. The taped telephone conversation between Alvarez and appellant was not incriminating on its face[6] and the prosecutor made only a brief reference to it in closing argument. The conversation did little, if anything, to prove the conspiracy charge; it did even less to prove appellant's consciousness of guilt of the murder.[7]

acy would be admissible to prove consciousness of guilt of the murder.

4. Our research has revealed only one case on point—*Crawford v. State*, 377 So.2d 145 (Ala. Cr.App.), *aff'd.*, 377 So.2d 159 (Ala.1979), *vacated and remanded*, 448 U.S. 904, 100 S.Ct. 3044, 65 L.Ed.2d 1134 (1980). In that case, a jailed defendant awaiting trial for murder solicited a fellow prisoner to assassinate the prosecution's chief witness. The prisoner went to the state and, for no benefit to himself, volunteered his aid in preventing the assassination. The state wired him, and he and the defendant engaged in a conversation where the only crime discussed was the plot to kill the witness. At defendant's murder trial, these statements were offered to prove consciousness of guilt. The Alabama courts upheld admission of the statements because they involved a crime separate from the crime for which the defendant was being held, the defendant initiated the conversation, and the Sixth Amendment did not con-

fer the right to counsel during commission of a crime. The United States Supreme Court vacated and remanded *Crawford* in light of its decision in *Henry*. For the reasons stated in the text, we believe *Crawford* is no longer a proper statement of the law.

5. All the conversations between Alvarez and appellant before Alvarez became a government agent were admissible because the *state* did not infringe on appellant's right to counsel at that time. *See United States v. Calder*, 641 F.2d 76 (2d Cir.), *cert. denied*, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981).

6. In fact, we find that the trial court could have excluded it under Rule 402, Rules of Evidence, as irrelevant. Failure to do so, however, was not fundamental error.

7. The trial court found that the conversation "lends support to defense counsel's argument that Alvarez was fabricating for his own benefit."

Moreover, the evidence of appellant's guilt of murder was overwhelming. Two eyewitnesses, the McCormack daughters, testified against appellant. A neighbor of the McCormacks' identified appellant's truck as the one in the alley behind the McCormack residence at the time appellant said he and his truck were at his residence. The knife used to commit the murder and the gasoline can used to fuel the fire were seized from appellant. Also, appellant's fingerprint was found on a delayed ignition device found at the scene of the crimes. Thus, even if trial counsel erred in failing to object to admission of the taped conversation, we find such error to be harmless beyond a reasonable doubt.

### 3. *Notes between appellant and his wife*

During the course of the conspiracy, appellant wrote various notes to his wife concerning the murder plot. Trial counsel did not move to exclude these notes and, in fact, used them as the basis of the conspiracy defense. Appellant testified that Alvarez coerced appellant into joining the conspiracy. Trial counsel argued to the jury that the notes proved that appellant and his wife were merely pretending to go along with Alvarez to avoid physical reprisals.

Appellant now urges us to find trial counsel's assistance ineffective for failure to object to the notes on the basis of the marital communications privilege. See A.R.S. § 13–4062(1). He claims that trial counsel was forced to use the notes to defend the conspiracy charge solely because the notes were not suppressed.

Our review of the record indicates that trial counsel always planned to use the notes to establish a defense. Appellant himself testified that the notes verified his defense. We do not question whether this was the best trial strategy. Mere errors in trial strategy do not constitute ineffective assistance of counsel. *State v. Flewellen*, 127 Ariz. 342, 621 P.2d 29 (1980). Trial counsel was not ineffective for failing to move to exclude the notes.

### 4. *Adequacy of trial preparation*

Our study of the record shows that in preparing for trial, appellant's trial counsel interviewed over seventy people, discussed trial tactics with several experienced attorneys, and studied arson and murder investigation. He also filed numerous pretrial motions, including motions to appoint a handwriting expert, to preclude evidence of appellant's wife's assault on Manuelita McCormack, to suppress gruesome photographs, to preclude certain physical evidence, to determine the competence to testify of Patricia and Bernice McCormack, and to exclude evidence of the conspiracy to murder.

Nevertheless, appellant alleges ineffective assistance in trial counsel's preparation. He believes that trial counsel should have investigated whether Manuelita McCormack was strangled and whether gasoline was used to start the fire at the McCormack residence. Appellant points to evidence uncovered by appellate counsel proving no strangulation and no use of gasoline. He then constructs a chain of hypotheticals based on this proof and concluding in impeachment of some of the witnesses against him. We find the proof uncovered by appellate counsel to be inconclusive and the hypothetical impeachment to go to collateral issues. Trial counsel's assistance also was not ineffective in this area.

### 5. *Miscellaneous claims*

To support his charge of ineffective assistance of counsel, appellant lodges a few miscellaneous complaints. He states that trial counsel was unaware the first degree murder indictment could include felony-murder, he did not ask for an instruction that good character alone can create a reasonable doubt, and his conduct resulted in a jury with an unbalanced sexual composition. Appellant does no more than merely state these facts; he does not discuss how these alleged failures resulted in ineffective assistance or prejudice to his case. Furthermore, appellant never raised these three particular points until he appealed to this Court. We are unable to conclude from the record that there was fundamental error concerning any of these three

points. Thus, appellant waived these arguments on appeal by failing to make a timely objection.[8] *E. g. State v. Mata*, 125 Ariz. 233, 609 P.2d 48 (1980); *State v. Newman*, 122 Ariz. 433, 595 P.2d 665 (1979).

## TESTIMONY OF FEAR OF APPELLANT

Bernice McCormack was eight years old at the time she testified. She related how appellant murdered her mother, stabbed her sister, stabbed her, and then tried to burn down the house while she and her siblings were still inside. During cross-examination, her credibility was challenged through inconsistencies between her testimony and prior statements. She also admitted that she remembered the events surrounding the crime better near the time of the crime than at trial.

At the end of the redirect examination, the following dialogue occurred between one of the prosecutors and Bernice:

"Q. Bernice, you said it was kind of hard to remember or it's gotten harder to remember now as compared to just after the fire. Why is that?

"A. I don't know.

"Q. You're pretty scared today.

"A. Yes.

"Q. What are you afraid of, is there something or somebody in the courtroom today that you're afraid of?

"A. (Witness nods.)

"Q. Who is it?

"A. (Witness points.)"

Bernice pointed to appellant and began to cry. Trial counsel immediately moved for a mistrial on the ground that this dialogue was too inflammatory. On appeal, appellant argues that the trial court erred in not granting the mistrial motion.

 We believe the questions and answers were proper to rehabilitate the witness, although neither party views the issue in this manner. Even if evidence has an inflammatory nature, if there is a legitimate, rehabilitative purpose that outweighs the prejudicial effect, the evidence is admissible in the trial court's discretion. *Cf. People v. Burke*, 52 Ill.App.2d 159, 201 N.E.2d 636 (1964) (prior sexual misconduct of defendant towards witness admissible to explain witness' admitted hatred of defendant); *State v. Harman*, 270 S.E.2d 146 (W.Va.1980) (defendant's molestation of his eleven-year old stepdaughter admissible to explain witness' expressed anger at defendant). In the instant case, given the nature of the acts to which Bernice testified appellant committed, we find little prejudice in her also testifying that she was afraid of appellant. Because of trial counsel's effective cross-examination, the evidence did have a substantial, legitimate, rehabilitative purpose. The trial court did not abuse its discretion in admitting the evidence and proceeding over appellant's motion for mistrial.

## AMENDMENT TO CONSPIRACY INSTRUCTIONS

The conspiracy indictment charged appellant with plotting to murder six of the potential witnesses against him—the murder victim's three children, sister, husband, and a female friend of the husband. Near the end of its deliberations, the jury sent the trial judge a note asking whether it could convict appellant of conspiracy if it found him guilty of conspiracy to murder fewer than all six people. The judge consulted with the attorneys and then gave the jury further instruction. He told the jury that it could convict for conspiracy if it found that appellant conspired to murder any of the six named people. He also gave the jury an interrogatory inquiring, in the event it found appellant guilty, against which of the six people it found appellant to have conspired. The jury found appellant guilty of conspiring to murder the three children only.

**8.** Appellate counsel jointly represented appellant at sentencing and at the motion to vacate judgment. Had appellate counsel's representation begun only on appeal, we might attribute the failure to timely raise these claims to trial counsel's ineffective assistance. We do not find appellate counsel's assistance ineffective, and he is jointly responsible for failure to timely raise these issues before appeal. Waiver of these issues, therefore, was not the result of ineffective assistance of counsel.

The issue appellant raises is whether the amended instruction changed the nature of the indictment and thereby violated his right to due process of law. *Ex parte Bain*, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), stands for the rule that a trial judge's amendment of a felony indictment violates the defendant's right to be indicted for a felony only by a grand jury. Appellant's reliance on *Bain* is misplaced.[9] First, the Grand Jury Clause has never been incorporated into the Due Process Clause of the Fourteenth Amendment. Therefore, it does not apply to state prosecutions. Second, the trial court did not amend the indictment but rather gave the jury a correct instruction on conspiracy law.

Appellant and Alvarez made one agreement—to kill the witnesses against appellant. There was evidence of an intent by appellant to aid the commission of murdering the witnesses. Because this was a conspiracy to commit murder, no overt act was required. Therefore, there was a conspiracy under A.R.S. § 13–1003(A).

The fact that the conspiracy involved murdering more than one person makes it a single conspiracy with multiple objects under A.R.S. § 13–1003(C). When an indictment charges a single conspiracy with multiple objects, a conviction will stand if the prosecution proves the defendant guilty of conspiring to commit any one of the objects. *See, e.g., United States v. Carman*, 577 F.2d 556 (9th Cir. 1978); *United States v. Papadakis*, 510 F.2d 287 (2d Cir.), *cert. denied*, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975); *United States v. Grizaffi*, 471 F.2d 69 (7th Cir. 1972). The trial court's instruction that the jury could convict appellant of conspiracy if it found he conspired to murder any one of the six potential victims was, therefore, a correct statement of the law.

**9.** Appellant also relies on *People v. McChristian*, 18 Ill.App.3d 87, 309 N.E.2d 388 (1974), *aff'd*, 60 Ill.2d 37, 322 N.E.2d 804 (1975). In that case, the defendant was charged with conspiring to murder a number of people at the same time by firing a gun into a crowded automobile. The court held that to convict, the state had to prove that the defendant intended to kill all the people in the vehicle. As charged, the defendant had to intend to kill all the riders

## SINGLE CONSPIRATOR

The state alleged that the conspiracy originally involved three conspirators—appellant, his wife, and Alvarez. At the time of appellant's sentencing, appellant's wife's case had been dismissed with prejudice and Alvarez had transactional immunity for his testimony against appellant. Hence, from that time, appellant was the only conspirator who could be convicted.

The law in Arizona under the pre-1978 criminal code was that no one conspirator's conviction could stand if no coconspirator could be convicted. *See Eyman v. Deutsch*, 92 Ariz. 82, 373 P.2d 716 (1962). Contrary to appellant's position, the law changed with the new criminal code.

A.R.S. § 13–1006(A) provides:

"It is not a defense to a prosecution for * * * conspiracy * * * that a person * * with whom the defendant conspired could not be guilty of committing the offense because: * * * (2) Such person is not criminally responsible as defined in chapter 5 of this title, or has an immunity to prosecution or conviction for the commission of the offense."

Section 1006 adopted the elements of § 606 proposed by the Arizona Criminal Code Commission. The commentary to § 606 states:

"Section 606, new to Arizona, specifically denies to a defendant the use of certain defenses often invoked under the bilateral view of conspiracy, solicitation and facilitation. Since this draft takes a unilateral view of these offenses, any party can now be subjected to the criminal justice system irrespective of the responsibility of others. Existing law in *Eyman v. Deutsch*, 92 Ariz. 82, 373 P.2d 716 (1962) is now changed. The immunity, minority, incapacity, nonprosecution

at the same time or he did not intend to kill anyone at all. In the instant case, appellant was charged with conspiring to murder six people, but he was not charged with plotting to kill them all in one occurrence, *e.g.*, by luring them all together and exploding a bomb. Thus, we do not reach the question whether *McChristian* will be followed in Arizona; rather, we hold it does not apply to appellant's case.

or acquittal of an accomplice has no bearing on the guilt of other participants. An individual who manifests a desire to further his or her criminal objectives by joining with others is hardly less responsible because he or she joined with an incompetent, an undercover agent, a person subsequently granted immunity or one otherwise incapable of being prosecuted for that crime."

Arizona Criminal Code Commission, *Arizona Revised Criminal Code* 86 (1975).

■ Under A.R.S. §§ 13–1003, –1006, the conviction of any conspirator is now independent of the conviction vel non of any coconspirator. Appellant's conspiracy conviction is not void on the basis that neither coconspirator can be prosecuted.

## CONSTITUTIONALITY OF ARIZONA'S DEATH PENALTY PROCEDURE

■ Appellant raises several challenges to Arizona's current procedure for imposing the death penalty.

### 1. "[E]specially heinous, cruel or depraved."

Relying on *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), appellant argues that this Court has interpreted the "especially heinous, cruel, or depraved" language of A.R.S. § 13–703(F)(6) in an unconstitutionally broad and vague manner. We disagree.

*Godfrey* involved Georgia's aggravating circumstance of a murder that is "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." Ga.Code Ann. § 27–2534.1(b)(7). The United States Supreme Court found that the *Godfrey* murder did not involve torture or aggravated battery as the Georgia Supreme Court had interpreted those terms. Also, the Court found that the *Godfrey* murder was not so depraved as to set it apart from the "usual" first degree murder. Therefore, Georgia erred in imposing the death penalty on *Godfrey* based on this aggravating circumstance.

*Godfrey* contains two rules. When a state has an aggravating circumstance that is the analog of a heinous, cruel, or depraved murder, the state: (1) must objectively define the terms used; and (2) must not use the circumstance as a catch-all for those first degree murders where no other aggravating circumstance applies. Arizona follows both of these rules.

We have objectively defined the relevant terms: a murder is "heinous" if "hatefully or shockingly evil;" "cruel" if "disposed to inflict pain esp. in a wanton, insensate or vindictive manner: sadistic;" and "depraved" if "marked by debasement, corruption, perversion or deterioration." *State v. Knapp*, 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978). Cruelty focuses on the sensations of the victim before death, depravity focuses on the murderer's state of mind, and heinousness focuses on society's view of the murder as compared to other murders. To use this aggravating circumstance, the trial court must find that the murder is *especially* heinous, cruel, or depraved. *State v. Lujan*, 124 Ariz. 365, 604 P.2d 629 (1979). We believe these standards satisfy *Godfrey* and that the especially cruel, heinous, and depraved aggravating circumstance has not been defined in an unconstitutionally broad and vague manner.

### 2. *Mitigating circumstances*

Appellant also challenges Arizona's death penalty procedure on the grounds that the enumerated mitigating circumstances in A.R.S. § 13–703(G) are too ambiguous and that neither the statute nor this Court has adequately defined when mitigating circumstances are "sufficiently substantial to call for leniency." We have previously considered these arguments and rejected them in *State v. Mata*, 125 Ariz. 233, 609 P.2d 48 (1980).

### 3. *Review procedure*

Appellant's final challenge to the constitutionality of Arizona's death penalty procedure is that it does not provide for a "proportionality review" as envisioned by *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). *Gregg* requires a review of the proportionality of all crimes where the death penalty could be imposed

so that the death penalty is not applied arbitrarily or capriciously.

This Court performs that function. We review all cases where the death penalty could be imposed. A.R.S. § 13–4031. The trial court is required to state with particularity its findings as to the aggravating and mitigating circumstances. A.R.S. § 13–703(D). Finally, this Court independently reviews the evidence presented at the aggravation-mitigation hearing. *State v. Richmond*, 114 Ariz. 186, 560 P.2d 41 (1976), *cert. denied*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977); *State v. Watson*, 129 Ariz. 60, 628 P.2d 943 (1981).

Our Court has performed the proportionality review as described above. For example, we found a murder to be especially depraved where the defendant burned to death his infant children, *State v. Knapp*, 125 Ariz. 503, 611 P.2d 90 (1979), and especially heinous, cruel, or depraved where the defendant and his accomplices successively raped the victim, beat her with their fists, struck her head against the cement floor, and eventually cut her throat, *State v. Mata*, 125 Ariz. 233, 609 P.2d 48, *cert. denied*, 449 U.S. 921, 101 S.Ct. 322, 66 L.Ed.2d 156 (1980). In those cases we affirmed the sentence of death. On the other hand, this Court has found a premeditated shooting of the defendant's wife or of a drug seller was not especially heinous, cruel, or depraved. *State v. Madsen*, 125 Ariz. 346, 609 P.2d 1046, *cert. denied*, 449 U.S. 873, 101 S.Ct. 213, 66 L.Ed.2d 93 (1980); *State v. Brookover*, 124 Ariz. 38, 601 P.2d 1322 (1979). We reduced the death penalty to life imprisonment in those cases. We will continue to review all potential death penalty cases to insure that the penalty is imposed only in those cases where the involved murder or defendant differs from the norm. *See State v. Watson*, 129 Ariz. 60, 628 P.2d 943 (1981).

## PROPRIETY OF DEATH PENALTY IN THE INSTANT CASE

Appellant's final set of claims relate to the propriety of imposing the death penalty in the instant case. He raises seven distinct issues.

Before proceeding to the merits of appellant's arguments, we note it is unclear under which death penalty statute appellant was sentenced. When appellant committed the crime in December, 1978, the death penalty statute as construed by this Court in *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253 (1978), *cert. denied*, 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979), was in effect. The Legislature amended A.R.S. § 13–703(G) in May, 1979 to conform with our holding in *Watson*. Appellant was sentenced in October, 1979.

The trial court correctly found that the sentencing procedure would be identical under either statute but did not specify which statute it used. To clarify the record, we hold that appellant was sentenced under A.R.S. § 13–703 as amended in May, 1979. Because appellant faced the same penalty and procedure under either statute, there is no constitutional defect in sentencing appellant under a statute not yet in effect when he committed the crime. *See Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).

### 1. *Notice of aggravating circumstances*

Based on the due process clause of the Fourteenth Amendment to the United States Constitution, appellant argues that he was entitled to notice of the aggravating circumstances that would be used to seek the death penalty and their underlying factual bases. We agree but find that appellant was given adequate notice.

"[T]he defendant is entitled to know the aggravating circumstances which the prosecution will seek to prove sufficiently in advance of court proceedings so that reasonable opportunity to prepare will be afforded." *State v. Sonnier*, 379 So.2d 1336, 1356 (La.1979). Thus, due process in an A.R.S. § 13–703 hearing requires of the prosecution three duties: (1) disclosure of the aggravating circumstances the state will seek to prove; (2) disclosure of the evidence the state will use; and (3) disclosure sufficiently in advance of the hearing that the defendant will have a reasonable opportunity to prepare rebuttal. The pros-

ecution in the instant case performed all three duties.

The prosecution notified both appellant and the trial court of what aggravating circumstances it would seek to prove. It filed a memorandum on September 10, 1979 indicating it would seek to prove the aggravating circumstances in A.R.S. § 13–703(F)(3) and (6). On October 2, 1979, it filed a supplemental memorandum disclosing that it would also argue the existence of the aggravating circumstance in A.R.S. § 13–703(F)(1).

The prosecution also met the disclosure duty as to what evidence it would use at the aggravation-mitigation hearing. A.R.S. § 13–703(C) provides, "Evidence admitted at the trial, relating to * * * aggravating or mitigating circumstances, shall be considered without reintroducing it at the sentencing proceeding." Thus, appellant was on notice that any evidence adduced at trial could be used to prove the aggravating circumstances. As to any evidence not produced at trial, the prosecution must disclose such additional evidence to the defendant. The prosecution made such additional disclosure in the instant case.

Finally, the prosecution in the instant case made timely disclosure. Appellant received notice of the aggravating circumstances in A.R.S. § 13–703(F)(3) and (6) and disclosure of additional evidence some three weeks before the aggravation-mitigation hearing. The prosecution did not notify appellant until two days before the hearing that it would seek to use his concurrent conspiracy conviction as a prior conviction under A.R.S. § 13–703(F)(1). But we hold that this was also timely because appellant could have offered no rebuttal, did not ask for a continuance of the hearing, and was not prejudiced.

Therefore, appellant had due process concerning notice of the aggravating circumstances.

*2. Use of appellant's wife's testimony from her conspiracy trial*

At the aggravation-mitigation hearing, the state introduced a transcript of appellant's wife's testimony at her trial for her part in the conspiracy. The transcript was used to rebut appellant's mitigation testimony that he was of good character, had been a good father, and had no prior criminal record. His wife had testified that appellant had beaten her a dozen times, pointed a gun at her, and had an affair with Manuelita McCormack. His wife did not herself testify at the aggravation-mitigation hearing. Appellant argues that admission of this testimony violated his confrontation clause rights under the Sixth and Fourteenth Amendments to the United States Constitution.

We must first decide whether the transcript was admissible under A.R.S. § 13–703(C) before we reach appellant's confrontation clause argument. A.R.S. § 13–703(C) provides:

"Any information relevant to any of the mitigating circumstances set forth in subsection G of this section may be presented by either the prosecution or the defendant, regardless of its admissibility under the rules governing admission of evidence at criminal trials; but the admissibility of information relevant to any of the aggravating circumstances set forth in subsection F of this section shall be governed by the rules governing the admission of evidence ·at criminal trials. * * * The prosecution and the defendant shall be permitted to rebut any information received at the hearing * * *."

A.R.S. § 13–703(C) defines the standards for admissibility of evidence directly proving aggravating or mitigating circumstances. It also states that both the prosecution and defendant may rebut what the other side tried to prove. But what § 703(C) fails to do is to define the standards for admissibility of rebuttal evidence.

▮ We partially fill this interstice by holding that under § 703(C), any relevant evidence may be used to rebut the defendant's mitigating circumstances regardless of its admissibility at trial.[10] This holding re-

---

**10.** We decline to consider at this time the standard of admissibility for evidence rebutting the prosecution's aggravating circumstances.

flects the legislative intent of our current criminal code, *see* A.R.S. § 13–101, and is consonant with the idea "that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial." *Williams v. New York*, 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337, 1342 (1949).

Of course, the fact that evidence is admissible within the meaning of A.R.S. § 13–703(C) does not necessarily indicate compliance with a defendant's constitutional rights. Therefore, we consider appellant's confrontation clause claim.

 We begin our analysis by observing that by its terms, the confrontation clause applies only to "trials" and not to sentencing hearings. Appellant grounds his claim, however, on our opinion in *State v. Hanley*, 108 Ariz. 144, 493 P.2d 1201 (1972). Hanley pled guilty to rape. At the aggravation-mitigation hearing, the two victims testified for the state to prove aggravating circumstances. The trial court precluded Hanley's cross-examination of the victims. In reversing the sentence, we said:

> "In the instant case, the defendant had a right to show any evidence which would mitigate the seriousness of the crime to which he had pleaded guilty. Undue restrictions on the right to cross-examine strike at the very heart of the adversary system:
>
> " ' * * * [a] denial of cross-examination without waiver * * * would be constitutional error of the first magnitude and no amount of showing of want of prejudice . would cure it.' [citations omitted]"

*Id.* at 148, 493 P.2d at 1205.

 We adhere to *Hanley* but find it inapplicable to the instant case. *Hanley* precludes denial of a defendant's right to produce mitigating evidence through cross-examination. Appellant, however, was denied the opportunity to rebut rebuttal evidence through cross-examination. He does not argue nor does the record show that he could have produced additional mitigation evidence through cross-examination of the state's rebuttal witness. Given the sentencing court's need for all relevant evidence to

make an informal, individualized decision, we find no error in the instant case.

*3. The same judge tried appellant, tried appellant's wife, and then sentenced appellant*

 After appellant's wife testified at her conspiracy trial, the state moved to dismiss, with prejudice, the charges against her. The prosecutor stated that he had a reasonable doubt as to her guilt. The trial judge, who had tried appellant's case and who later sentenced appellant, said, "[Y]ou can add the Court to that, if you want to."

Appellant alleges that the court's statement in his wife's case shows that the court was predisposed to believe his wife's testimony and version of the conspiracy and disbelieve him. The record does not support this charge. We have searched the entire record and find no evidence of the trial court being biased against appellant. We read the statement in appellant's wife's trial as showing only that the court agreed that there was a reasonable doubt as to the wife's guilt.

*4. Grave risk of death to others*

 For the death penalty to be imposed, the state must prove beyond a reasonable doubt the existence of at least one aggravating circumstance. *State v. Jordan*, 126 Ariz. 283, 614 P.2d 825 (1980). The trial court found that in committing the murder, appellant knowingly created a grave risk of death to others, an aggravating circumstance under A.R.S. § 13–703(F)(3).

The basis for the trial court's finding was that appellant knowingly created a grave risk of death to the three McCormack children when he tried to dispose of Manuelita McCormack's body by burning down the house. Appellant had stabbed two of the children and told all three to stay in the house until the fire department arrived. Appellant points out that the state did not prove beyond a reasonable doubt that Mrs. McCormack was alive when the fire started. He then urges us to find as a matter of law that once the murder victim is dead, nothing the murderer does thereafter can be considered part of the "commission of the

offense" within the meaning of A.R.S. § 13–703(F)(3). We decline to do so.

 Concealment of the murder is legally part of the murder transaction. *Cf. State v. Richmond*, 114 Ariz. 186, 560 P.2d 41 (1976) (for purposes of the felony-murder rule, flight from the felony is legally a part of the felony transaction), *cert. denied*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977). "[W]e will not hold a stopwatch on the events" of the murder "to avoid the clear intent of the legislature in enacting" A.R.S. § 13–703(F). *See Richmond*, 114 Ariz. at 190, 560 P.2d at 45. Appellant's actions squarely fit within the aggravating circumstance of knowingly creating a grave risk of death to others.

5. *Especially heinous, cruel, or depraved*

The trial court made the following findings in its special verdict:

"The Court further finds that the aggravating circumstance set forth in Subparagraph 6 does exist. The defendant committed the offense in an especially cruel, heinous, and depraved manner.

"In that regard the Court finds that the defendant, in the home of the victim, a defenseless woman, inflicted upon her multiple stab wounds in the neck and chest areas. It was impossible to determine the exact number of stab wounds because of the condition in which the victim's body was recovered. The defendant left the victim lying on the floor in the living room. It's impossible to determine if she was dead at that time or not. The defendant then took Patricia McCormack, age 9, from her bedroom into the living room and stabbed her with the same knife he had used on her mother. She was then put in another, different bedroom, and the defendant then got Bernice McCormack, age 8, and stabbed her, again with the same knife, and put her with Patricia.

"He next poured gasoline next to, on or upon the body of the mother and in other areas of the home so as to prevent the

children from leaving when the fire ignited.

"He then went to the bedroom where his godson Charles McCormack III was sleeping and, using clothing, attempted to start a fire there without accelerant.

"He then returned to the mother and ignited the accelerant and left the home blazing, with the victim and the three young children still in the home."

 We disagree with the trial court that this murder was especially cruel as defined in *State v. Knapp*, 114 Ariz. 531, 562 P.2d 704 (1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978). The state did not prove beyond a reasonable doubt that the victim suffered during commission of the murder. We agree with the remainder of the trial court's findings, however, and hold that this murder was especially heinous and depraved as defined in *Knapp*.[11] *Cf. State v. Bishop*, 127 Ariz. 531, 622 P.2d 478 (1980); *State v. Knapp, supra.* Beyond a reasonable doubt, this murder was far more heinous and depraved than the norm of first degree murders.

6. *The conspiracy conviction*

 Appellant raises several challenges to the use of the conspiracy conviction as an aggravating circumstance. We need only consider one of them.

A.R.S. § 13–703(F)(1) states:

"Aggravating circumstances to be considered shall be the following:

"1. The defendant has been convicted of another offense in the United States for which under Arizona Law a sentence of life imprisonment or death was impossible.

* * * *"

We note that neither the statute nor legislative intent indicates clearly the latest time at which a conviction must be entered to come within the meaning of A.R.S. § 13–703(F)(1). We therefore give the words what we believe to be their plain meaning: to be an aggravating circum-

11. Although many of the facts supporting the finding concern what appellant did to the children rather than the murder victim, circumstances surrounding the murder are relevant to

determining "the murderer's mental state at the time of the killing." *State v. Lujan*, 124 Ariz. 365, 372, 604 P.2d 629, 636 (1979).

stance under A.R.S. § 13–703(F)(1), a prior conviction must be entered prior to the time for which jeopardy attaches on the first degree murder charge that subsequently results in a § 703 sentencing hearing. Because appellant's conspiracy conviction was not entered until the conclusion of the murder trial, it should not have been considered as an aggravating circumstance under A.R.S. § 13–703(F)(1).

### 7. *Mitigating circumstances*

As is required by A.R.S. § 13–703(D), the trial court gave a special verdict on the murder conviction which set forth a detailed examination of mitigating circumstances. The court found that the length of the jury deliberations, appellant's ability to distinguish right from wrong, appellant's alleged duress, and appellant's alleged lack of intent to kill were not mitigating circumstances under the facts of this case. The court did find these "possible" mitigating circumstances: (1) appellant's lack of a prior criminal record; (2) appellant's intelligence; (3) appellant's standing as a responsible citizen; (4) appellant's standing as a good father; (5) appellant's activities in jail (offset by his spending the first three months of incarceration conspiring to kill the witnesses against him); and (6) the likelihood of recidivism (offset by the conspiracy). The court concluded:

> "These factors indicated above, which might ordinarily constitute mitigating circumstances are not such by reason that the facts that the Court learned principally from the trial and the testimony of the defendant's wife in her trial, that evidence disclosed and the Court finds that the defendant was an adulterer, a violent wife beater, and a liar."

The Court imposed the death penalty.

Appellant argues that the trial court erred in not finding the mitigating circumstances proffered by appellant. Our reading of the trial court's verdict indicates that whatever mitigation evidence appellant offered, it was not sufficiently substantial to call for leniency. We have independently reviewed the evidence in a painstaking manner, and we agree.

## CONCLUSION

We have reviewed the entire record for fundamental error pursuant to A.R.S. § 13–4035. We affirm all the convictions in this case. We hold that appellant's conspiracy conviction is not an aggravating circumstance for the murder conviction within the language of A.R.S. § 13–703(F)(1). Nevertheless, we find that two aggravating circumstances were proved beyond a reasonable doubt and that the mitigating circumstances are not sufficiently substantial to call for leniency. Therefore, the sentence of death was properly imposed. We also affirm the sentences on all other counts.

The judgment and sentences are affirmed.

STRUCKMEYER, C. J., HOLOHAN, V. C. J., and HAYS and CAMERON, JJ., concur.