515 So.2d 86 (1987)
Richard Lee EDWARDS
v.
STATE.
1 Div. 997.
Court of Criminal Appeals of Alabama.
April 28, 1987.
As Modified on Denial of Rehearing June 9, 1987.
On Return to Remand September 21, 1987.
*87 James H. Lackey, Mobile, for appellant.
Charles A. Graddick, Atty. Gen., and Rivard Melson and William D. Little, Asst. Attys. Gen., for appellee.
TAYLOR, Judge.
The appellant, Richard Lee Edwards, was indicted under § 13A-5-40(a)(10) for the intentional murder of Edgar Neese and William Dial. The jury returned a verdict finding appellant guilty as charged in the indictment. Thereafter, in accordance with the recommendation of the jury, the trial court imposed the death penalty on appellant.
The record reveals that on March 13, 1984, appellant was employed by Otto Neese, Sr., on a painting crew that was performing work on a house in Prichard, Alabama. Appellant rode to the work site with another employee, Kenneth Crosby. Crosby testified that appellant had been drinking and that he stopped and purchased a bottle of wine on the way to work. Appellant, on the way to work, told Crosby that he was going to kill Edgar Neese and Douglas Neese, father and son, who were also employees of Neese Construction Company. Crosby paid little heed to the threat, however, because appellant had, in the past, made a number of similar threats to other workers.
The workers at the site took their lunch break between 11:30 and 12:00. During this time, appellant left and went to his house, which was nearby. When he returned, he had a bottle of wine in one hand and a 12-gauge shotgun in the other. At this time Crosby and co-worker Cedric Ellis were sitting in the cab of a truck at the site. Edgar Neese, Douglas Neese, and an electrician, James Creel, were standing at the rear of the truck.
Appellant approached the three men at the rear of the truck and said, "I done killed one and I'm gonna kill y'all." Edgar Neese turned towards appellant, put up his hands and said, "Now, Jim, there's nobody *88 gonna hurt...." Before Edgar Neese could finish the sentence, appellant shot him in the face, killing him. Douglas Neese ran around the truck and tried to get in the truck with Ellis and Crosby. Appellant pursued him and shot him in the right shoulder as he tried to get into the truck. Douglas Neese, after being shot, was able to make his escape, by running through a nearby ditch, and summon authorities.
Ellis and Crosby were also able to escape to a wooded area across the street from the job site. As they ran, Crosby testified, he heard a third shot and heard buckshot sprinkling down in the bushes.
Officer Crenshaw, of the Prichard Police Department, arrived at the scene and discovered Edgar Neese lying dead behind the truck. He also found two spent shotgun shells at the scene.
Officers English and Barrow, of the Prichard Police Department, at approximately this same time, were dispatched to a shooting at 718 Neese Street. When they arrived, they observed William Dial lying dead in the street by a bicycle. He had suffered gunshot wounds to the chest, neck, and face. Near his body, they discovered three spent shotgun shells. The bodies of William Dial and Edgar Neese were separated by a distance of approximately three hundred yards.
Officer English asked a group of onlookers, "Who did the shooting?" At this, appellant came forward and said, "I did the shooting." Appellant was placed in custody.
Officer Harbin, of the Prichard Police Department, then approached Officers Barrow and English and asked them, "Where is the gun?" Appellant spoke up and said, "It's in the house, I'll show you where it is." At this, he went with officers to his house, where the officers retrieved a pump shotgun from the wall in his front bedroom. When Officer Harbin picked up the gun, appellant said, "That's the pump I used."
It was stipulated at trial that all of the spent shotgun shells found at each shooting scene were fired from the same pump shotgun that was recovered from appellant's home.

I
The appellant contends that the trial court erred when it granted the challenges of all jurors who stated that they had a fixed opinion against the death penalty and that they would not return a verdict of death by electrocution under any circumstances. Appellant contends that because the jury was "death qualified" he was denied the right to a fair and impartial jury in the guilt phase of the trial. He further contends that such a "death qualified" jury is more likely to convict in the guilt phase of the trial.
This court has previously addressed these arguments and has determined them adversely to appellant. Clark v. State, 451 So.2d 368 (Ala.Cr.App.1984); Taylor v. State, 442 So.2d 128 (Ala.Cr.App.1983); McGinnis v. State, 382 So.2d 605 (Ala.Cr. App.1979), cert. denied, 382 So.2d 609 (Ala. 1980). Recently, the United States Supreme Court considered the question: "Does the Constitution prohibit the removal for cause, prior to the guilt phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the trial?" Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). The Court held, even if certain studies which McCree presented were assumed to be adequate to establish that "death qualification," in fact, produces juries somewhat more "conviction prone" than "non-death qualified" juries, that the Constitution does not prohibit the States from "death qualifying" juries in capital cases. Lockhart, 476 U.S. at 173, 106 S.Ct. at 1764. The Court held that the "death qualification" of the jury does not violate the Sixth Amendment's "fair cross-section" requirement, and that it also does not violate the defendant's right to trial by an impartial jury. The Court noted that "the Constitution presupposes that a jury selected from a fair cross-section of the community is impartial, *89 regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." 476 U.S. at 184, 106 S.Ct. at 1770.
Upon the foregoing authority, the appellant's argument regarding the death qualification of the jury in this case must fail.

II
The appellant contends that because Alabama's capital punishment statute vests final sentencing authority with the trial court, it violates Article I, Section 11, of the Alabama Constitution of 1901. This issue has been fully addressed by this court, and it was determined that "the advisory nature of the jury's sentence verdict under § 13A-5-46, Code of Alabama 1975, is not violative of Article I, Section 11." Crowe v. State, 485 So.2d 351, at 364 (Ala.Cr.App. 1984), reversed on other grounds, Ex parte Crowe, 485 So.2d 373 (Ala.1985).
The appellant also contends that Article I, Section 11, of the Alabama Constitution of 1901 is violated by § 13A-5-46(f), which allows the jury to return an advisory verdict based on the vote of 10 of the jurors. Appellant argues precisely that the "allowance of the imposition of the ultimate penalty on a 10-2 vote violates Article I, Section 11, of the Constitution and renders the statute unconstitutional." Contrary to appellant's argument, the death penalty is not invoked on the basis of the jury's recommendation. The jury's role in sentencing under our bifurcated trial process is merely advisory in nature. This procedure was established in Beck v. State, 396 So.2d 645 (Ala.1980), and was determined to be constitutional. Appellant raises no legitimate argument as to why this procedure, as established, should now be found to be unconstitutional. For the foregoing reasons, appellant's attack on the constitutionality of our present sentencing procedure in capital cases must fail.

III
Appellant contends that the process of weighing aggravating and mitigating circumstances under Alabama's capital punishment statute violates the Eighth and Fourteenth Amendments to the United States Constitution. He contends that sentencing under the statute is arbitrary and capricious because no exact weight is assigned to each of the aggravating and mitigating circumstances.
Our courts have held that the determination of whether the aggravating circumstances outweigh the mitigating circumstances is not a numerical one, but, instead is based upon the gravity of the aggravating circumstances compared to that of the mitigating circumstances. Murry v. State, 455 So.2d 53 (Ala.Cr.App.1983), reversed on other grounds, 455 So.2d 72 (Ala.1984); Ex parte Clisby, 456 So.2d 105 (Ala.1984), cert. denied, 470 U.S. 1009, 105 S.Ct. 1372, 84 L.Ed.2d 391 (1985). The trial judge is, therefore, free to consider each case on an individual basis in order to determine whether aggravating circumstances outweigh mitigating circumstances and vice versa. Ex parte Clisby, supra; Moore v. Balkcom, 716 F.2d 1511 (11th Cir.1983), cert. denied, 465 U.S. 1084, 104 S.Ct. 1456, 79 L.Ed.2d 773 (1984).
In Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), Proffitt argued a nearly identical issue as that now presented by appellant. He argued that it was impossible to make a rational determination in the weighing of aggravating and mitigating circumstances "since the state law assigns no specific weight to any of the various circumstances to be considered." Proffitt, 428 U.S. at 257, 96 S.Ct. at 2969. The Court held that "[w]hile these questions and decisions may be hard, they require no more line drawing than is commonly required of a factfinder in a lawsuit." Proffitt, 428 U.S. at 257, 96 S.Ct. at 2969. The Court continued:
"While the various factors to be considered by the sentencing authorities do not have numerical weights assigned to them, the requirements of Furman are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition *90 of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition.
"The directions given to judge and jury by the Florida statute are sufficiently clear and precise to enable the various aggravating circumstances to be weighed against the mitigating ones. As a result, the trial court's sentencing discretion is guided and channeled by a system that focuses on the circumstances of each individual homicide and individual defendant in deciding whether the death penalty is to be imposed." Proffitt, 428 U.S. at 258, 96 S.Ct. at 2969.
We, likewise, find that although numerical weights are not assigned to the various factors, the sentencing authority's discretion is sufficiently guided and channeled by Alabama's capital murder statute to eliminate the danger of arbitrariness or capriciousness in the imposition of the sentence.

IV
Appellant contends that the trial court erred in denying his motion to suppress the shotgun that the police recovered from appellant's home.
Appellant had just confessed and had been taken into custody when Officer Harbin approached Officers Barrow and English and asked them, "Where is the gun?" The question was not directed at appellant, but he spoke up and said, "It's in the house, I'll show you where it is." At this, he accompanied officers to the house, where the murder weapon was found.
The search of appellant's home and the recovery of the murder weapon were certainly consensual. The issue which is presented, however, is whether the conversation between the officers amounted to the "functional equivalent" of a custodial interrogation prior to appellant's being advised of his Miranda[1] rights. Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).
In Innis, supra, the respondent, who was suspected of armed robbery, was taken into custody and advised of his Miranda rights. After being advised of his rights he stated that he would like to exercise his right to consult with an attorney. He was then placed in a police car with two officers for transport to the police station. The officers were instructed not to question Innis. However, the two officers, on the way to the station, carried on a conversation regarding the necessity of finding the missing shotgun. They discussed their familiarity with the area and the fact that there were many handicapped children in the area, and one of them stated, "God forbid one of them might find a weapon with shells and they might hurt themselves." Innis, 446 U.S. at 294, 295, 100 S.Ct. at 1686, 1687. Innis interrupted the officers and told them that if they would return to the scene he would show them where the gun was located, which he did.
The Supreme Court held that the Supreme Court of Rhode Island erred in setting aside Innis's conviction on the grounds that the "subtle compulsion" exercised by the officers was the equivalent of interrogation. The Court, in arriving at its decision in Innis, quoted from a relevant portion of Miranda, that being:

"The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.... Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." Innis, 446 U.S. at 300, 100 S.Ct. at 1689. (Emphasis added in Innis.)
The Court then noted that "[i]t is clear, therefore, that the special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." Innis, 446 U.S. at 300, 100 S.Ct. at 1689.
The Court held that while it might be true that Innis was subjected to "subtle compulsion," that should not be the end of the inquiry. The Court noted that "[i]t must also be established that a suspect's *91 incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." The Court went on to hold that it was not established. Innis, 446 U.S. at 303, 100 S.Ct. at 1691.
As was the case in Innis,supra, this case "boils down to whether ... the officers should have known that the respondent would suddenly be moved to make a self-incriminating response." After a careful review of the record, we are convinced that when Officer Harbin made his inquiry of Officers English and Barrow he had no way of knowing that such inquiry was reasonably likely to elicit an incriminating response from appellant. See also our application of Innis in West v. State, 511 So.2d 258 (Ala.Cr.App.1987).
Furthermore, had the evidence indicated that Officer Harbin asked appellant directly where the gun was, we are convinced that the subsequent recovery of the shotgun would still be valid under the authority of New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). In Quarles, a woman approached two police officers and told them she had just been raped. She described her assailant and told the officers that he was armed with a gun and that he had just entered a nearby supermarket. One of the officers entered the store, sighted the suspect, and chased him through the store. Before apprehending Quarles, the officer lost sight of him for several seconds. The officer handcuffed Quarles, frisked him, and discovered that he was wearing an empty shoulder holster. Prior to reading Quarles his Miranda rights, the officer asked him where the gun was and Quarles responded that, "the gun is over there." The officer then retrieved the gun and formally placed appellant under arrest.
Quarles was charged in the trial court of New York with the criminal possession of a weapon. The trial court suppressed the gun and a statement made by Quarles because the officer did not inform Quarles of his Miranda rights prior to asking him where the gun was. Both the Appellate Division of the Supreme Court of New York, 447 N.Y.S.2d 84, 85 A.D.2d 936 (1981), and the New York Court of Appeals, 58 N.Y.2d 664, 458 N.Y.S.2d 520, 444 N.E.2d 984 (1982), affirmed. The Supreme Court, in Quarles, supra, reversed, stating at a most relevant point that:
"We conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination. We decline to place officers such as Officer Kraft in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the Miranda warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them."
Quarles, 467 U.S. at 657-658, 104 S.Ct. at 2632.
We find that even if Officer Harbin had directed his question concerning the whereabouts of the gun at appellant, his actions were justified, pursuant to Quarles, supra. The officers in the instant case were faced with a situation where there were a number of bystanders, they did not know where the appellant had disposed of the gun, and they were concerned that one of the victim's relatives might seek to harm the appellant. If the gun had been disposed of by appellant outside after the shooting, there was an immediate danger that someone, either a bystander or appellant, could be shot. We find that this scenario presented sufficiently exigent circumstances to warrant the invocation of the "public safety" exception established in Quarles, supra.
Therefore, whether Officer Harbin asked the other officers where the gun was and the appellant volunteered the information, or whether Officer Harbin directly made his inquiry of the appellant, we find that *92 the trial court did not err in refusing to suppress the shotgun found as a result of appellant's statement and directions.

V
Appellant contends that the trial court erred when, while considering the mitigating circumstances in its sentencing order,[2] it found that:
"(1) Based upon the pre-sentence investigation, the Court cannot say that the defendant has no significant history of prior criminal activity; hence, this is not a mitigating circumstance."
In the pre-sentence report, which the trial court referred to, the court was confronted with the following criminal history on the appellant.

 "CRIMINAL HISTORY
"PRIOR RECORD:
"4-21-58 PD Mobile, Al Investigative Could not locate any details.
10-4-65 PD Mobile, Al Disorderly Conduct Not available
2-5-66 PD Mobile, Al Disorderly Conduct $25 & CC; pd 2-9-66
5-21-66 PD Mobile, Al Disorderly Conduct $25 & CC; pd. 5-25-66
2-24-68 PD Mobile, Al Disorderly Conduct [Nol-prossed] 2-29-68
8-10-68 PD Mobile, Al Drunk $15 & CC; pd. 8-12-68
11-19-68 PD Mobile, Al Disorderly Conduct $25 & CC; pd. 12-5-68
3-1-68 PD Mobile, Al Assault w/knife Not available
8-15-69 PD Mobile, Al Disorderly Conduct $15 & CC pd. 8-21-69
6-29-70 PD Mobile, Al Disturbing the Peace [Nol-prossed]
1-9-71 PD Mobile, Al Drunk $15 & CC pd. 1-11-71
8-17-71 PD Mobile, Al Disorderly Conduct [Nol-prossed] 8-23-71
Pending Offense:
3/84 PD Prichard Assault, 1st Degree The details of this offense are
 the same as those in the present
 offense. It involves the shooting
 of Douglas Neese."

This Court has previously held that an appellant convicted of five misdemeanors, specifically, criminal possession of dangerous drugs, disorderly conduct, carrying a weapon unlawfully, unlawful entering of a building, and criminal trespassing in the first degree, could not be said to have no significant history of prior criminal conduct. Murry v. State, 455 So.2d 53 (Ala. Cr.App.1983), reversed on other grounds, 455 So.2d 72 (Ala.1984). In view of this Court's decision in Murry, and the criminal history of appellant, which the trial court was apprised of in this case, we find that the trial court committed no error in finding that the mitigating circumstance of no significant prior criminal conduct did not apply to the appellant.

VI
Appellant contends that the trial court erred in finding as an aggravating circumstance that he knowingly created a great risk of death to many persons as provided by § 13A-5-49(3). Appellant argues that the number of persons placed in jeopardy by his actions did not constitute "many," as provided by the statute.
The record reveals that appellant first killed William Dial with three shotgun blasts on a residential street. He then proceeded back to the job site. There he shot and killed Edgar Neese as he stood with his son Douglas Neese and James Creel. He then pursued Douglas Neese and shot him as he attempted to get in the truck with Kenneth Crosby and Cedric Ellis. Then, as Crosby and Ellis fled, Crosby heard another shot and the sound of buckshot sprinkling down, indicating that appellant had fired at them. In addition to the two persons who were actually killed by *93 appellant, Douglas Neese, James Creel, Cedric Ellis, and Kenneth Crosby were certainly in a great risk of death, as they were either shot or shot at, or were in direct proximity of the shotgun blasts fired by appellant. Furthermore, we note that all of the shots were fired in a residential neighborhood and that many of those residents were at risk from flying shotgun pellets.
In Crawford v. State, 377 So.2d 145 (Ala. Cr.App.), affirmed, Ex parte Crawford, 377 So.2d 159 (Ala.1979), reversed on other grounds, Crawford v. Alabama, 448 U.S. 904, 100 S.Ct. 3044, 65 L.Ed.2d 1134 (1980), it was held that Crawford, who systematically shot a number of his family members, satisfied the requisites for being charged with the aggravating circumstance of knowingly creating a great risk of death to many persons. We are unable to discern any appreciable difference between Crawford, supra, and the instant case on this issue.
We, therefore, conclude that the trial court committed no error in finding that the aggravating circumstance provided by § 13A-5-49(3) existed, as it is apparent that appellant did, in fact, create a great risk of death to many persons.

VII
Appellant contends that it was error for the trial court to include as an aggravating circumstance the fact that the defendant committed the crime of murder by intentionally murdering two persons pursuant to one scheme or course of conduct because it was not one of the statutory aggravating circumstances under § 13A-5-49, Code of Alabama 1975.
Our Supreme Court has held that "the jury and the trial judge at the sentencing hearing may find the `aggravation' averred in the indictment as the `aggravating circumstance,' even though the `aggravation' is not listed in § 13-11-6[3] as an `aggravating circumstance.'" Ex parte Kyzer, 399 So.2d 330, 339 (Ala.1981). The aggravation charged in the indictment in Kyzer was that "two or more human beings were intentionally killed by the defendant by one or a series of acts," which is nearly identical to that charged in the instant case. For these reasons, we find that the trial court committed no error in considering the aggravation averred in the indictment as an aggravating circumstance at sentencing.

VIII
Appellant contends that the trial court erred in denying his motion to suppress his confession. He contends, specifically, that the trial court erred in finding that he made a knowing, voluntary, and intelligent waiver of all constitutional rights, in view of the testimony of clinical psychologist Dr. Clyde Van Rosen.
Dr. Rosen testified that he examined appellant and felt that he was suffering from several mental disorders, those being: (1) alcohol dependence continuous, (2) paranoid personality, and (3) borderline intellectual functioning. With regard to appellant's ability to waive his rights, the following questioning of Dr. Rosen, by defense counsel, occurred:
"Q In your opinion, could he give a knowing, intelligent waiver of his rights to the police asking questions of him?
". . . .
"A I believe he was most likely impaired.
"Q Are you saying that most likely he could not knowingly and intelligently waive it?
"A I really doubt that he could." (Emphasis added.)
Then, when Dr. Rosen was questioned by the prosecution on another aspect of the appellant's mental ability, specifically, appellant's ability to conform his conduct to the requisites of the law, the following occurred:
"Q Dr. Rosen, you stated that in your opinion on March the 13th, 1984 there was a good possibility that he could not *94 conform his conduct to the requisites of the law; is that right?
"A Yes, sir.
"Q You're not saying that he could not, just that it was possible that he could not?
"A I don't believe I can state conclusively. I think there is a strong likelihood that he could not." (Emphasis added.)
With regard to appellant's I.Q. of 77, Dr. Rosen testified that he did not think that it could be said that it, by itself, would mean that appellant did not understand what his rights were, or that he should not be expected to be able to control his behavior. With regard to appellant's alcohol dependence, we note that the officer who read appellant his rights and took his statement at the police station, about an hour and a half after he had been taken into custody, testified that appellant did not appear to be intoxicated at all, and that he appeared to be lucid and coherent. Furthermore, Officer Harbin testified that as he read appellant his rights, he asked the appellant if he understood each and every one of the rights, and appellant stated that he did.
In view of the less than definite statements made by Dr. Rosen regarding appellant's mental ability, and the testimony of Officer Harbin regarding the appellant's condition at the time his rights were read to him and his apparent understanding of those rights, we find that the trial court did not err in its discretionary decision to allow the appellant's confession into evidence. Furthermore, we note that in view of the number of eyewitnesses to the Neese murder, the appellant's statement prior to the Neese shooting that, "I done killed one and I'm gonna kill y'all," and his surrender and confession at the scene, the confession at the police station was apparently somewhat less than a key element in appellant's conviction.

IX
Appellant, a black man, contends that this case is due to be reversed because black persons were systematically excluded from the petit jury.
The record reveals three separate occasions in which the appellant sought to preserve this issue for appellate review. Ten of the eleven black members of the jury venire were excused by peremptory strikes of the prosecution.
In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held that the "state's privilege to strike individual jurors through peremptory challenges, is subject to the commands of the Equal Protection Clause," and that it "forbids the prosecutor to challenge potential jurors solely on account of their race." Batson, 476 U.S. at 89, 106 S.Ct. at 1718-19. The prosecution in Batson used its peremptory challenges to remove all blacks on the jury venire from the petit jury. The Court, noting that petitioner had made a timely objection to the prosecutor's removal of all black persons on the venire, remanded the case in order to allow the prosecutor to come forward with race-neutral explanations for his action. In the absence of such explanations, the Court held that the case was due to be reversed. The Court stated that "a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." Batson, 476 U.S. at 96, 106 S.Ct. at 1722-23. Our Supreme Court has held that the equal protection guarantees of the state constitution, Sections 1, 6, and 22, Alabama Constitution 1901, require a result identical to that of the United States Constitution as stated in Batson. Ex parte Jackson, 516 So.2d 768 (Ala.1986).
In the instant case, before trial, Edwards's counsel filed the following motion:

"MOTION IN LIMINE
"Comes now the Defendant, by and through counsel, and hereby moves that the Court enter an order precluding the District Attorney from using his peremptory challenges to exclude members of Defendant's race from the jury selected to try this case on the following grounds:

*95 "1. Defendant is a black citizen of the State of Alabama.
"2. Race-motivated exclusion of prospective black jurors violates the Defendant's right to a fair trial and to due process of law under the Sixth and Fourteenth Amendments of the United States Constitution.
"3. Race-motivated exclusion of prospective black jurors violates the Defendant's right to trial by an impartial jury under the Alabama Constitution.
"4. A systematic pattern of exclusion of prospective black jurors exists in the judicial circuit."
This motion, by its plain language, gives the court notice of the issue.
On the day of trial, before selection of the jury, the following occurred:
"MR. KNIGHT: Your Honor, I'm sorry, there's one other motion that we filed directed toward the selection of the jury and that is motion in limine directed toward the selection by the State of black, or the exclusion by the State of black jurors. And we've asked in that motion that Your Honor order the State not to exclude black jurors strictly on the basis of race because it's a violation of the United States ... of our client's right to a fair trial under the Sixth and Fourteenth Amendments. It's a violation of our client's right to a fair trial under the Constitution of the State of Alabama and the right to an impartial jury selected by a jury of his peers [sic]. We would ask Your Honor for an order to the State relative to this.
"THE COURT: You mean in the exercise of their peremptory challenges?
"MR. KNIGHT: Yes, sir.
"THE COURT: Motion denied.
"All right. Bring the jury in. (To Bailiff.)"
This oral motion again called the issue to the court's attention.
After the jury was selected, the appellant through counsel renewed his objection on the record at length, detailing by name each black venireman struck, and then citing legal authorities in support of his position. The following then occurred:
"[MR. KNIGHT:] Those cases, Your Honor, we would argue stand for the proposition under either state law or federal law that systematic exclusion of blacks from a petit jury by the State violates either the Constitution of the State, which we would raise and argue and preserve for review that this practice constitutes a violation of the Constitution of the State of Alabama and of the United States Constitution under the Sixth and Fourteenth Amendments, my client's right to a fair trial.
"THE COURT: Do you wish to respond, Mr. Galanos?
"MR. GALANOS: If it please the Court, we would simply say that it's obvious that some of our strikes were black people. But there's no evidence before the Court nor is there in fact any evidence in existence that it was part of some plot or scheme to systematically exclude black people from the jury.
"THE COURT: All right. Motion denied."
As demonstrated above, the attorneys representing Edwards raised the issue three times: by written motion in limine, by oral motion in limine, and after the jury was selected. Since Batson had not been announced by the United States Supreme Court, defense counsel did not have the benefit of the procedural instructions set out in Batson. We should not decide this case based on whether the lawyers complied with Batson procedure, but should consider whether the court was placed on notice that Edwards alleged a systematic exclusion of members of his race. He certainly did. Since Batson, the procedural requirements have been clarified.
In United States v. Erwin, 793 F.2d 656 (5th Cir.), cert. denied, ___ U.S. ___, 107 S.Ct. 589, 93 L.Ed.2d 590 (1986), Erwin's counsel waited until after the jury was struck and the remainder of the venire had left, before making a motion to strike. As stated by the Fifth Circuit, "The court in Batson envisioned that a motion to strike would be made promptly, probably before *96 the venire was dismissed. See [476 U.S. 79,] at 99 & n. 24, 106 S.Ct. at 1724 & n. 24." Erwin, 793 F.2d at 667. When the objection is not timely made, the trial court is deprived of the opportunity to remedy the error and save the case. As a matter of common sense, the court should have the chance to hold a Batson hearing, and, if necessary, start the selection procedure over.
Erwin had not been decided when this case was tried. For purposes of this case, the procedure as set out in Batson and Erwin is not controlling. But the constitutional principle is controlling, since Batson was decided while this case was pending on direct appeal. Griffith v. Kentucky, ___ U.S. ____, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). We hold that the issue was clearly and sufficiently brought to the attention of the court and was preserved for appellate review. Consequently, the case must be remanded for a "Batson hearing."
Even if it be held that the objections by Edwards's counsel were untimely, this issue may yet be lawfully before us because of the plain error rule. Rule 45A, Alabama Rules of Appellate Procedure. Rule 45A, A.R.A.P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."

Batson states:
"... to establish such a [prima facie] case, the defendant first must show that he is a member of a cognizable racial group ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of defendant's race."
In this case the essential elements of the issue were directly stated to the court and denial of the motion was error under Batson. We are reluctant to call the event "error," because the prosecutor and court correctly applied the law as it was understood on the date of trial, and as is spelled out in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). As explained, this case was tried before the decision in Batson; it was pending on direct appeal at the time of the Batson decision, and for that reason is governed by Batson. Griffith, supra.
This case is due to be remanded for a Batson hearing for the circuit court to first determine whether the facts present a prima facie case of purposeful discrimination. Ex parte Owens, [Ms. 85-1008, March 27, 1987] (Ala.1987). If the court finds that a prima facie case has been established, the court should then allow the prosecutor an opportunity to testify to what his reasons were for his strikes of ten of the eleven blacks from the jury venire, and decide whether he has presented sufficiently "race-neutral" explanations. If the prosecutor is unable to present sufficiently race-neutral explanations, the appellant is entitled to a new trial. If the evidence indicates appellant is entitled to a new trial, the circuit court should order a new trial and proceed accordingly, sending notice to this court of its action. Should the trial court determine that there was no purposeful discrimination by the district attorney, a return shall be filed with this court containing the evidence at this hearing and the trial judge's finding following the hearing.

X
As required by § 13A-5-53(a), Code of Alabama 1975, this court reviews the propriety of the imposition of the death penalty in this case. Our review must include a determination of the following questions:
(1) Was any error adversely affecting the rights of the defendant made in the sentence proceedings?
(2) Were the trial court's findings concerning the aggravating and mitigating circumstances supported by the evidence?
(3) Was the death penalty the proper sentence in this case?
*97 As to the first question, we have reviewed the sentence proceedings and have found no error adversely affecting the defendant's rights. As to the second question, we have reviewed the record and are satisfied that the trial court's written findings concerning the aggravating and mitigating circumstances are fully supported by the evidence.
To answer the third question, whether the death penalty was properly imposed in this case, we must determine:
"(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
"(2) Whether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence; and
"(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
Alabama Code 1975, § 13A-5-53(b); see also Beck v. State, 396 So.2d 645 (Ala. 1981).
There is nothing in the record before us which even intimates that the death penalty was imposed under the influence of passion, prejudice, or any other arbitrary factor.
Our independent weighing of the aggravating and mitigating circumstances leaves us with no doubt that the death penalty was appropriate in this case. We find that there was one statutory aggravating circumstance in this case, as provided by § 13A-5-49(3), Alabama Code 1975. This was that the appellant knowingly created a great risk of death to many persons. In addition, we find that one non-statutory aggravating circumstance, as allowed by Ex parte Kyzer, 399 So.2d 330 (Ala.1981), existed. This was the aggravation averred in the indictment that appellant intentionally murdered two persons pursuant to one scheme or course of conduct. We further find that there were no statutory mitigating circumstances, as provided by § 13A-5-51, Alabama Code 1975. Finding none of the statutory mitigating circumstances under § 13A-5-51 to be applicable and none of the claims of non-statutory mitigating circumstances raised by appellant to have merit, we determine that the aggravating circumstances clearly outweigh the mitigating circumstances and that the death penalty was appropriate in this case.
In regard to the final determination this court must make, we find that the death penalty imposed on the defendant is not excessive or disproportionate to the penalty imposed in similar capital murder cases. See, e.g., Hill v. State, 455 So.2d 930 (Ala. Cr.App.), affirmed, Ex parte Hill, 455 So. 2d 938 (Ala.1984), cert. denied, 469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984); Crawford v. State, 377 So.2d 145 (Ala.Cr. App.), affirmed, Ex parte Crawford, 377 So.2d 159 (Ala.1979), vacated on other grounds, 448 U.S. 904, 100 S.Ct. 3044, 65 L.Ed.2d 1134 (1980); see also, Ex parte Kyzer, 399 So.2d 330 (Ala.1981).
We have searched the record as required by Rule 45A, A.R.A.P., for any plain error or defect which may have adversely affected the substantial rights of the appellant. Other than the issue set forth above which is the basis of the remand of this case, we have found no error or defect which may have adversely affected appellant's rights.
REMANDED WITH DIRECTIONS.
All the Judges concur.

APPENDIX
Number CC-84-001198

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

ORDER
The Court having conducted a Sentence Hearing to determine whether or not the Court will sentence the Defendant, Richard Lee Edwards, to death or to life imprisonment without parole, and the Court having considered the evidence at the trial and at said Sentencing Hearing, the Court makes the following Findings of Fact:
*98 The Court first considers the aggravating circumstances as outlined and described in Section 13A-5-49 of the Code of Alabama 1975.
(1) The Court finds that the only aggravating circumstance specifically outlined in Section 13A-5-49 which exists in this case is that the Defendant did knowingly create a great risk of death to many persons, in that the Defendant knowingly and intentionally killed two (2) persons, and attempted to kill a third person, which said third person was gravely injured as a direct result of a shotgun blast fired by the Defendant in an attempt to kill him. The Court further finds from the evidence that there were other persons present who suffered a grave risk of death as a direct result of the shotgun blasts fired by the Defendant.
(2) The Court further finds, under the decision of the Supreme Court of Alabama in the case of Ex Parte Kyzer, 399 So.2d 330, that an aggravating circumstance exists in that the Defendant committed the crime of murder by intentionally murdering two persons pursuant to one scheme or course of conduct.
(3) The Court finds the facts to be from the evidence and beyond a reasonable doubt that the Defendant, Richard Lee Edwards, was working at his job on the 13th day of March, 1984, and left his job at lunch time and went to his house at 718 Neese Avenue, located in Prichard, Mobile County, Alabama. Shortly after Edwards got home for lunch, he exited his house, exchanged some words with a black male named William Dial and shot him three times in the chest and face with a shotgun, killing him. This event occurred in the middle of the street.
Edwards then left this scene and went directly to the job site at which he had been working earlier in the day, encountered his supervisor, Edgar Neese, and his son, Donald Neese. Edwards then made statements that he had just killed someone and now he was going to kill them. At that point, Edgar Neese starting to say something and Edwards shot him in the face with a shotgun blast, killing him. Edwards then shot Donald Neese in the shoulder with a shotgun. None of the victims were armed and none of the victims did anything to provoke the Defendant. These were simply cold-blooded, senseless killings.
The Court now considers the mitigating circumstances as described and set out in Section 13A-5-51 of the Code of Alabama 1975.
(1) Based upon the pre-sentence investigation, the Court cannot say that the Defendant has no significant history of prior criminal activity; hence, this is not a mitigating circumstance;
(2) Although there was evidence, which the Court believed, that the Defendant was emotionally disturbed, primarily as a result of his drinking habits, the Court does not find that this was extreme mental or emotional disturbance sufficient to warrant a finding that it was a mitigating circumstance; hence, the Court finds that this is not a mitigating circumstance;
(3) The Court does not find that the victims were participants in the Defendant's conduct or consented to the act;
(4) The Court does not find that the Defendant was an accomplice in the capital offense committed by another person and that his participation was relatively minor;
(5) The Court does not find that the Defendant acted under extreme duress or under the substantial domination of another person;
(6) The Court finds that the capactiy of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired;
(7) The Court finds that the age of the Defendant at the time of the crime is not a mitigating circumstance.
The Court having considered the statutory mitigating circumstances and, in addition, having listened to and having considered all of the non-statutory mitigating circumstances presented by the Defendant's attorney, the Court is convinced beyond a reasonable doubt and to a moral certainty, and it is the judgment of the Court that the aggravating circumstances *99 outweigh the mitigating circumstances outlined hereinabove, and the Court finds that the death penalty is the appropriate punishment in this case.
It is therefore considered and adjudged by the Court that Richard Lee Edwards is guilty of the capital offense charged in the indictment, and specifically of intentionally killing William Dial and Edward [sic] Neese, pursuant to one scheme or course of conduct.
It is therefore ORDERED, ADJUDGED AND DECREED that you, Richard Lee Edwards, suffer death by electrocution at any time before the hour of sunrise on 25th day of May, 1985, inside the walls of the William C. Holman Unit of the Prison System at Atmore, Alabama, in and [sic] a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution.
It is therefore further ORDERED, ADJUDGED AND DECREED by the Court that the Warden of William C. Holman Unit of the Prison System at Atmore, or in the case of his death, disability or absence, his Deputy, or in the event of the death, disability or absence of both the Warden and his Deputy, then the person designated as Administrator by law for such purpose, at any time before the hour of sunrise on the 25th day of May, 1985, inside the walls of the William C. Holman Unit of the Prison System at Atmore, in a room arranged for the purpose of electrocuting convicts sentenced by death by electrocution, cause to pass through the body of the said Richard Lee Edwards, a current of electricity of sufficient intensity to cause his death, and the continual application of such current through the body of the said Richard Lee Edwards until the said Richard Lee Edwards be dead, and may Almighty God have mercy on Your Soul.
ORDERED this the 27th day of February, 1984.
 ___________________________
 BRAXTON L. KITTRELL, JR.
 Circuit Judge

ON RETURN TO REMAND
TAYLOR, Judge.
On remand the circuit court conducted a hearing in accord with the requirements of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and Griffith v. Kentucky, 479 U.S. ___, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). The trial court entered the following order:
"This cause was remanded to this Court by the Court of Criminal Appeals to determine whether the prosecution could provide non-racial reasons for its use of peremptory strikes in selecting the jury which convicted the defendant of a capital felony. [citation omitted]
"In compliance with that order and the mandate of [Batson], this Court ordered a hearing. Prior to the appointed time, the prosecution candidly informed the Court that its jury selection records were incomplete and, though it did not concede racial bias, it could not satisfy the burden of proof as mandated by Batson.

"Accordingly, it is ORDERED, ADJUDGED, and DECREED that the defendant is entitled to a new trial, which this Court will schedule upon return of the mandate from the Court of Criminal Appeals.
"DONE this 28th day of July, 1987.
 "/s/ Braxton L. Kittrell, Jr.
 Circuit Judge"
The court has correctly applied Batson. This appeal is dismissed.
OPINION EXTENDED; APPEAL DISMISSED.
All the Judges concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] That sentencing order is set out in an appendix to this opinion.
[3] Section 13-11-6 under the 1975 capital murder statute and the present § 13A-5-49 are virtually identical.