521 So.2d 93 (1987)
Calvin Darrell TURNER
v.
STATE.
7 Div. 237.
Court of Criminal Appeals of Alabama.
September 8, 1987.
On Return to Remand February 18, 1988.
*94 H. Keith Pitts and Mac Downs, Gadsden, for appellant.
Charles A. Graddick, Atty. Gen., and Helen P. Nelson and William D. Little, Asst. Attys. Gen., for appellee.
McMILLAN, Judge.
Calvin Darrell Turner was indicted on two counts of the capital offense of intentional murder during the course of robbery in the first degree. The appellant entered a plea of not guilty, not guilty by reason of insanity, and not guilty by reason of mental disease or defect. He was found guilty of the capital offense, and, after a sentencing hearing, the jury recommended that he be punished by life imprisonment without parole. A written pre-sentence investigation report was made, and, thereafter, the trial court sentenced the appellant to death by electrocution.
Sudie Heard arrived at the home of the victim, Mae Belle Wright, between 7:00 and 7:30 a.m. on April 1, 1983. Heard was employed by the 82-year-old victim as a cook and housekeeper. Heard found the victim's front door unlocked and upon entering the house noted that the home had apparently been ransacked. She then walked through the house calling the victim's name and found her body on the floor between the dining room and kitchen. She attempted to use the telephone but it had been disconnected. Therefore, she ran across the street and telephoned for help.
Dr. Josefino Agular, a forensic pathologist, performed an autopsy on the body of Mae Belle Wright. He determined that she suffered multiple injuries, including cutting wounds and blunt force trauma. The victim's tongue and upper portion of her breathing apparatus were severed by "a 6½ single stroke incise wound" to the neck. There was also hemorrhaging in the neck as a "result of crushing." Dr. Agular testified that, in his opinion, the victim died as a result of strangulation.
The appellant made two different statements concerning the murder and robbery. Although the admissibility of these statements is contested, the portions pertinent to the circumstances of the offense are hereinafter included. The first statement was made on April 19, the day after the appellant was taken into custody. The appellant, in his first statement, gave the following account:
"On Friday, April 1st, 1983 I came off the strip and had been down at the 20 Grand Club and was en route to my house at 332 Ewing Avenue. This was about 3:30 A.M. I was walking on Ewing Avenue toward my house and I saw a light on inside this house. I walked over to the house and walked up on the porch and rang the door bell. [An] elderly gray headed lady came to the door, and opened the door. She was expecting someone else because she called someone's name and said is that you, and I said yes. Then she unlatched the screen and turned around and walked back inside the house. I locked the door back and followed her on into the house. There was [sic] some gloves laying by a piano and I picked them up and put them on... Then she was turning around so I reached and grabbed her around the neck, and she was struggling to get loose. And her neck started bleeding but I don't remember cutting her throat. I do remember seeing a lot of blood coming from her neck. I got scared and took her arm and let her fall to the floor easy. She was laying between the den and kitchen. She started to trying to get up [sic] at the telephone because it was right there at her. I saw she could not get up and I started going from room to room seaching for jewelry or money just anything I could find. I found an old watch that was not running and a silver *95 watch that was running. I got two rings out of the bedroom. I also found a lady's purse. I then looked out the front windows to see if anyone was out there. I did not see anybody so I left out the front door. I then walked on up Ewing Avenue toward my house and I threw the purse off the side of the street into the weeds. After I thew the purse and stuff away I walked on past my house and set [sic] down on the side the street. I set [sic] there for a while. Then I went on to my house. I threw the watch that did not work away when I threw the purse away. The silver watch that did work I flushed it down the toilet at my house. Then the next day I got Carlton Malone [Emmitt's grandson] to carry one of the rings to Jack's and pawn it for $20.00. The other ring I must have lost it."
The following day, on April 20, the appellant made another statement alleging that the first was not "completely" correct. He stated, in his second statement, in pertinent part:
"On Thursday, March 31, 1983, before dark I was in the 6th Street projects on the basketball court shooting ball. When I finished I walked over to Mrs. Emma Jean Bothwell's house. There I met Cedric Thomas and [Fire Mouth] Britton. We set [sic] on Mrs. Bothwell's step and talked. Fire Mouth told us about a white lady that he had done some yard work for. He said this lady was white and she lived close to me and asked if I knew her. I said no. After a while Fire Mouth said we should go and rob her as he had heard she had money and asked me if I had ever heard this. I told him that I didn't know anything about her. After we decided to rob this lady I went back to the basketball court and I got into a crap game and walked up the strip... At about 6 o'clock p.m. or so, myself, Cedric Thomas and Melvin Fire Mouth Britton got together at 6th Street. I don't remember the exact location. We talked some more about this lady and planned how we was [sic] going to go into the house. We decided that we would brake [sic] a window and reach in and unlock the door. After making our plans we separated and went in different directions. We met back in 6th Street projects at about 8:30 p.m. We walked from 6th Street to the house on Ewing Avenue which took us about 20 minutes. When we got to the house, Fire Mouth said this is the one, there was [sic] some lights on. Cedric rang the door bell, Fire Mouth and myself stood off to the side of the door. The lady opened the front door and asked something, is that you? I didn't understand the name she called but Cedric said `Yes' and she unlocked the screen. Cedric went in first and Fire Mouth and myself went behind him at about this same time. When I got into the living room I saw the old lady going back toward the kitchen and Cedric was right behind her and I was behind Fire Mouth. When we got to about the door way of the dining room and kitchen, Cedric grabbed the old lady by the shoulder and she said, `Oh' or something like this and Cedric started cursing her and saying something like shut up you old bitch, old bat and thing [sic] like this and he then grabbed her by the throat and started choking her. I didn't want to see this so I started looking out the window as we had decided this was to be my part of the crime. I was to be the lookout. I could hear the old lady grasping [sic] for air. I turned around and told Cedric to let her go a couple of times. He said, `F____ the old bitch' and I then walked over to where he was choking her and grabbed her arm and I said let her go man and Cedric said `Well f____ it' and let her go. I had hold of her arm and I eased her down onto the floor. I saw blood coming from her neck when I let her down and I know Cedric had his knife out because I saw it when I asked him to let her go. I don't know if Cedric cut her throat while he was choking her or if he did it while we were searching the house. I looked in the front bedroom and hall and the bedroom where there was a sewing machine with a lot of buttons in it. In this room I found a ring in a box and I also found another ring and two watches but I don't *96 remember their exact location. I was also in the bedroom for just a second but I didn't touch anything in there. We all three got through searching about the same time and we met in the living room and we all left the house together. We walked north up Ewing toward my house and we all had something in our hands. I don't remember who had what. We threw some stuff in the bushes across from my house and we walked on past where I lived. I think we walked up to the corner where Wiggs Store is and Cedric and Fire Mouth walked up a hill on the side street off Ewing and left me on the corner. I just sat down on the curb for a while for no more than five minutes or so and I went on home. When I got home I flushed a lady's silver looking watch down the toilet and there was another one which didn't run. I had throwed [sic] it in the bushes with the other stuff we threw away. The next day I got with a friend of mine, Carlton Malone and got him to pawn one of the rings which has now been recovered by the police and I have identified it as being the one I gave him to pawn. He got $20.00 for it which I kept. There was another ring which I took but I have lost it somewhere. I was with Carlton in Jake's Pawn Shop when [he] pawned it. He did all the talking and I stood around. Since myself, Cedric Thomas and Melvin [Fire Mouth] Britton committed the crime, Cedric and myself have had trouble. Cedric has threatened my life if I ever talk to the police or anyone about it. I am at this time in fear of my safety and request all the protection I can get."
The victim's niece and the niece's husband both identified, at trial, the rings that were recovered by the police as having belonged to the victim. There was further testimony as to the value of this jewelry.
The appellant presented a defense of insanity or mental defect. He introduced evidence that his intelligence tests revealed that he was close to the range of mental retardation. He also introduced testimony that when he was approximately nine years old, he was badly burned in a gasoline fire and was hospitalized and forced to undergo treatment for an extended period, and to drop out of school for approximately one year. The defense contends that the appellant's personality and nature were changed as the result of his burns. The appellant underwent mental and psychological treatments following that incident.
The defense counsel made a motion for mistrial based on the exclusion of all potential blacks from the jury by the prosecutor, following the selection of a jury panel drawn from 82 potential jurors, the jury retired and the defense counsel claimed that the prosecutor intentionally excluded all of the blacks from the jury and noted that the defendant is black. The court denied the motion and the defense counsel excepted for the record. The State rested its case, and the defense counsel moved to exclude the evidence, and discharge the appellant on several grounds. The defense counsel renewed his motion for a mistrial based on the State's striking of all potential black jurors. The trial court again denied the defense counsel's motion. No reasons for the strikes were ever volunteered or stated by the prosecutor.
The case sub judice is a capital case in which the death penalty has been imposed, and, thus, the timeliness of the defense counsel's objection would not preclude our review under Rule 45A, Alabama Rules of Appellate Procedure. See Edwards v. State, 515 So.2d 86 (Ala.Cr.App.1987); Henderson v. State, [Ms. 5 Div. 32, June 9, 1987] (Ala.Cr.App.1987). Although the trial in the instant case transpired prior to the United States Supreme Court holding in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the rule in Batson is to be applied retroactively. Ex parte Jackson, 516 So.2d 768 (Ala.1986). Furthermore, Batson was decided while this case was pending on direct appeal. Edwards, supra, citing Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).
This cause must be remanded for an evidentiary hearing under the mandate *97 of Batson, supra. At that hearing, the defendant, in order to establish a prima facie case of purposeful discrimination, must show that he is a member of "a cognizable racial group," and that members of his race were removed from the venire by the prosecutor's peremptory strikes. Batson v. Kentucky, 476 U.S. at 96, 106 S.Ct., at 1723. If the trial court determines that the defendant has established a prima facie case of discrimination, the burden shifts to the prosecution to come forward with race-neutral explanations for striking the black jurors. Id. "[T]he prosecutor must give a `clear and reasonably specific' explanation of his `legitimate reasons' for exercising the challenges." Batson v. Kentucky, 476 U.S. at 98, 106 S.Ct., at 1724 n. 20 (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981)). If the prosecutor is unable to come forward with race-neutral explanations for his use of peremptory strikes, and the trial court determines that the facts establish a prima facie case of purposeful discrimination, then the appellant is entitled to a new trial. Ex parte Owens, [Ms. 85-1008, March 27, 1987] (Ala.1987). See also Henderson v. State, supra.
The remaining issues will be addressed if the trial court determines that a prima facie case of purposeful discrimination does not existor has been overcomeand this cause is thereby returned to this Court.
REMANDED WITH INSTRUCTIONS.
All the Judges concur.

ON RETURN TO REMAND
McMILLAN, Judge.
Following a hearing, the trial court has determined that a prima facie case of purposeful discrimination was established as to the prosecutor's use of peremptory strikes in excluding all of the blacks on the venire from jury service. The appellant is therefore entitled to a new trial. Jurisdiction of this cause is remanded to the circuit court. This appeal is moot and is, therefore, dismissed.
OPINION EXTENDED; APPEAL DISMISSED.
All the Judges concur.